[No. S061215. July 29, 1999.]

CATES CONSTRUCTION, INC., et al., Plaintiffs, Cross-defendants and Appellants, v.
TALBOT PARTNERS et al., Defendants, Cross-complainants and Respondents;
TIG INSURANCE COMPANY, Plaintiff, Cross-defendant and Appellant, v.
TALBOT PARTNERS et al., Defendants, Cross-complainants and Respondents.

**COUNSEL**

Law Offices of William J. Allard and William J. Allard for Plaintiff, Cross-defendant and Appellant Cates Construction, Inc.

Bryan Cave; William I. Chertok; Bottum & Feliton, Steve Johnson, Jerry Garcia; Horvitz & Levy, Barry R. Levy, Daniel J. Gonzalez, Ari R. Kleiman and Andrea M. Gauthier for Plaintiff, Cross-defendant and Appellant TIG Insurance Company.

Michael A. Mathews for Crum & Forster Insurance as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant TIG Insurance Company.

Long & Levit, Doan A. Lesser and John H. Quinn for the Association of California Surety Companies as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant TIG Insurance Company.

Busch & Berger, Richard S. Busch and William R. Moore for Amwest Surety Insurance Company as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant TIG Insurance Company.

Anderson, McPharlin & Conners, G. Wayne Murphy, David T. DiBiase and Mark E. Aronson for National Bond Claim Association as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant TIG Insurance Company.

Hugh F. Young, Jr.; Mayer, Brown & Platt, Evan M. Tager and Donald M. Falk for Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant TIG Insurance Company.

Sonnenschein Nath & Rosenthal, Paul E. B. Glad and Cheryl Dyer Berg for Alliance of American Insurers, Fireman's Fund Insurance Company and National Association of Independent Insurers as Amici Curiae on behalf of Plaintiff, Cross-defendant and Appellant TIG Insurance Company.

Wright, Robinson, Osthimer & Tatum and Peter C. Haley for American Insurance Association and the Surety Association of America as Amici Curiae on behalf of Plaintiffs, Cross-defendants and Appellants.

John S. Alevra; Marcus M. Kaufman; Armand Arabian; Shoop & Leanse, Paul Shoop; Buchalter, Nemer, Fields & Younger and Bernard E. LeSage for Defendants, Cross-complainants and Respondents Talbot Partners and PAA Interpro.

Price, Postel & Parma, J. Terry Schwartz, Christopher E. Haskell; Esner, Higa & Chang, Andrew N. Chang and Stuart B. Esner for Defendants, Cross-complainants and Respondents Bank of Montecito and Mountain Financial Corporation.

## OPINION

**BAXTER, J.**—This case presents issues relating to the contract and tort liability of a commercial surety to a real estate developer under a bond guaranteeing the contract performance of a general contractor on a multimillion dollar condominium construction project. For the reasons set forth below, we conclude that the bond at issue contractually obligates the surety to pay damages attributable to the general contractor's failure to promptly and faithfully perform its contract obligations by the agreed date. We further conclude that, as a matter of law, the developer may not recover in tort for

the surety's breach of the covenant of good faith and fair dealing implied in the performance bond. In light of these conclusions, we reverse the judgment of the Court of Appeal insofar as it affirmed the underlying award of tort damages for breach of the implied covenant and permitted an award of punitive damages.

## FACTUAL AND PROCEDURAL BACKGROUND

The following background is taken in large part from the Court of Appeal opinion.

In 1989, Talbot Partners (Talbot) hired Cates Construction, Inc. (Cates) to build a condominium project in Malibu on property purchased by Talbot for $1 million. The construction contract called for Cates to complete the project and have it ready for occupancy in eight months. Talbot received financing for the construction through the Bank of Montecito (the bank). The financing was secured by a deed of trust on the property and was conditioned on the issuance of a performance bond in favor of the bank.

At the time the construction contract was signed, Talbot required Cates to furnish a performance bond and a labor and materials payment bond. Transamerica Insurance Company (Transamerica),[1] a commercial surety company, issued the bonds in favor of Talbot as obligee and the bank as co-obligee. Talbot paid the $27,000 premium on the bonds. Transamerica and Cates also executed an indemnity agreement which allowed Transamerica to recover from Cates all good faith disbursements made under the bonds.

Construction on the project began on May 1, 1989. Cates and Talbot agreed to various extensions on the completion date. At trial, Talbot waived any claim for damages through June 1, 1990.

A fund control agreement required Cates to submit monthly applications to Talbot for reimbursement of costs incurred. Funds were to be disbursed only after review of the requests by Talbot and the bank and after confirmation of the progress of the work. During the course of construction, Cates submitted 22 payment requests which were paid as submitted. The 23d request, submitted in early November of 1990, was not paid because both Talbot's and Cates's records showed that Talbot had already paid several hundred thousand dollars more than the cost of work. After attempts to resolve disagreements failed, Cates threatened to abandon the project as of December 4, 1990, unless additional amounts were paid.

---

[1]Transamerica is now known as TIG Insurance Company.

On November 29, 1990, six months after the contract should have been completed, Talbot advised Transamerica that Cates intended to default and that Talbot already had paid everything it owed under the contract. Talbot demanded that Transamerica perform under the bond. In December, Cates abandoned the project and recorded a mechanic's lien in the amount of $645,367.

After many discussions among the parties, on January 9, 1991, Transamerica informed Talbot of its position that Talbot had breached the contract by failing to make payments. Transamerica refused to intercede or arrange for performance of the contract, claiming a legitimate dispute existed between Cates and Talbot. Correspondence and communications continued.

On February 14, 1991, Cates, at Transamerica's request, gave Talbot notice of its voluntary default. Also in February, Cates assigned its rights against Talbot to Transamerica. On March 1, 1991, Talbot and the bank informed Transamerica that as a result of the delayed completion of the construction contract, Talbot was in default on its loans and the bank was proceeding to foreclose. At that time there was over $935,000 in mechanics' liens against the project, including Cates's lien.

On March 14, 1991, by which time Cates was out of business, Transamerica filed this action on Cates's behalf to foreclose on its mechanic's lien. On March 19, 1991, Transamerica began the process of completing the job pursuant to the performance bond.

On May 10, 1991, Transamerica joined as plaintiff in Cates's lawsuit against Talbot, alleging causes of action for breach of the construction contract, foreclosure on the mechanic's lien, and declaratory relief. They later named the bank as a defendant. Talbot cross-complained against Cates for breach of the construction contract and against Transamerica for recovery under the performance bond, breach of that bond and the labor and materials payment bond and breach of the implied covenant of good faith and fair dealing in the performance bond. In December of 1991, the bank cross-complained against Transamerica for breach of the bonds.

On June 18, 1991, the bank foreclosed on the project. At that time, Talbot owed the bank $7,753,282. Construction was not complete and some of the work was defective and required repair. The project also lacked permit sign-offs for certificates of occupancy.

By stipulation of the parties, the contract claims were tried before retired California Supreme Court Justice David Eagleson, sitting without a jury.

Justice Eagleson ruled against Transamerica and Cates on all of their causes of action. Those rulings have not been appealed.

On Talbot's cause of action against Cates, Justice Eagleson found that Cates breached the contract by, inter alia, failing to construct the project in good quality and free of defects; charging rates substantially higher than standard local rates; and failing to use the construction funds to pay subcontractors, resulting in mechanics' liens on the project. He determined that all delays beyond June 1, 1990, were caused by Cates, and that if Cates had not breached the contract, the project would have been available for Talbot to sell on or before June 1, 1990.

On Talbot's causes of action against Transamerica, Justice Eagleson made the following findings. Transamerica breached the performance bond by failing to adequately investigate Talbot's declaration that Cates was in default and by joining in the mechanic's lien suit without such an investigation. Had such an investigation occurred, it would have disclosed that Cates was in default, that Cates's abandonment was unjustified, and that at the time of the abandonment, Cates had been paid the full cost of work, plus an additional sum of $267,730, and was owed no further amounts. Transamerica also breached by failing to promptly complete Cates's contract when Cates's default would have been readily apparent after an investigation. Transamerica arbitrarily determined what work it would perform under the performance bond and failed to fully complete Cates's contract. In addition, Transamerica breached the labor and materials payment bond by not promptly paying lien claimants.

Justice Eagleson determined that Transamerica's breaches of the performance bond caused the loss of the project and the damages awarded, and that its breaches of the labor and materials payment bond contributed to Talbot's damages. Transamerica was liable for all damages caused by Cates's breaches of the construction contract, and was not exonerated or excused from performance under the bonds.

Justice Eagleson awarded damages of $3,142,021 in favor of Talbot and against Transamerica and Cates. Of that sum, $2,596,600 represented the difference between the fair market value the project would have had on June 1, 1990, if it had been complete on that date, discounted to take into account the cost of holding and selling the units, and the amount Talbot would have owed the bank on that date.[2] The remainder of the award reflected $276,730, which Cates had overdrawn, and $268,691, which Talbot paid on the project after June 1, 1990.

---

[2]Justice Eagleson confirmed this amount was not a calculation of profit.

38

With regard to the bank's claims, Justice Eagleson found that the bank, as co-obligee, had the same rights as Talbot and was owed the same duties by Transamerica. He awarded the bank damages of $1.2 million for impairment of its security interest and $252,295 for Cates's defective work.

After trial of the contract claims, Talbot tried its tort cause of action against Transamerica to a jury before the Honorable William E. Burby, Jr. On Transamerica's motion, the jury was not informed of the findings or the award in the breach of contract trial. The parties also stipulated to compensatory tort damages in the total amount of $1. After hearing evidence regarding the entire course of conduct between all the parties, the jury determined that Transamerica breached the implied covenant of good faith and fair dealing and was guilty of malice and oppression in doing so. The jury awarded $28 million in punitive damages.

The Court of Appeal modified the judgment to reduce the amount of punitive damages to $15 million and remanded to the trial court for a recalculation of prejudgment interest. The judgment was affirmed in all other respects. As relevant here, the Court of Appeal determined that Talbot was properly awarded $2,596,600 against Transamerica for damages attributable to Cates's failure to timely complete the construction contract. The court also determined, based on its conclusion that surety bonds are insurance, that obligees such as Talbot could recover tort damages for breaches of the implied covenant of good faith and fair dealing. Finally, the court found sufficient evidence of malice and oppression to support punitive damages, but reduced the awarded amount to $15 million on federal due process grounds.

## DISCUSSION

A surety is "one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor." (Civ. Code, § 2787.) A surety bond is a " 'written instrument executed by the principal and surety in which the surety agrees to answer for the debt, default, or miscarriage of the principal.' " (*Butterfield* v. *Northwestern National Ins. Co.* (1980) 100 Cal.App.3d 974, 978 [161 Cal.Rptr. 280].) In suretyship, the risk of loss remains with the principal, while the surety merely lends its credit so as to guarantee payment or performance in the event that the principal defaults. (*Schmitt* v. *Insurance Co. of North America* (1991) 230 Cal.App.3d 245, 257 [281 Cal.Rptr. 261].) In the absence of default, the surety has no obligation. (*Ibid.*)

This case presents three questions relating to the construction performance bond executed by Cates (the principal) and Transamerica (the surety) in

which Transamerica agreed to answer in the event of Cates's default under its construction contract with Talbot (the obligee).[3] First, is Transamerica contractually liable under the performance bond for damages attributable to Cates's failure to complete the project by June 1, 1990? Second, may an obligee recover in tort for a surety's breach of the covenant of good faith and fair dealing in the context of a construction performance bond? Third, if tort recovery is available, is the instant award of $15 million in punitive damages nevertheless excessive in light of the parties' stipulation at trial that Transamerica's tortious conduct resulted in actual damages of $1? We shall address these issues in order.

## A. Liability for Damages Caused by Contractor's Delay

Transamerica does not dispute that, under the construction contract, Cates is liable to Talbot for damages of $2,596,600 (representing lost equity) caused by Cates's failure to complete the condominium project by June 1, 1990. At issue, however, is whether Transamerica is liable under the performance bond for those so-called "delay damages." Transamerica disputes liability because the bond, in its view, did not guarantee Cates's prompt performance but merely assured completion of the condominium project in the event of Cates's default. The issue is one of contract interpretation.

Performance bonds, like all contracts of surety, are construed with reference to the same rules that govern interpretation of other types of contracts. (*Roberts* v. *Security T. & S. Bank* (1925) 196 Cal. 557, 566 [196 Cal. 575, 238 P. 673], overruled on another ground in *Peter Kiewit Sons' Co.* v. *Pasadena City Junior College Dist.* (1963) 59 Cal.2d 241, 245 [28 Cal.Rptr. 714, 379 P.2d 18]; Civ. Code, § 2837.) To ascertain the nature and extent of Transamerica's liability, we look first to the express terms of the performance bond. (*Roberts* v. *Security T. & S. Bank, supra,* 196 Cal. at p. 564.) Properly undertaken, construction of a performance bond " 'does not mean that words are to be distorted out of their natural meaning, or that, by implication, something can be read into the contract that it will not reasonably bear; but it means that the contract shall be fairly construed with a view to effect the object for which it was given and to accomplish the purpose for which it was designed.' " (*Id.* at p. 566, citing *Sather Banking Co.* v. *Briggs Co.* (1903) 138 Cal. 724, 730 [72 P. 352]); see *Bloom* v. *Bender* (1957) 48 Cal.2d 793, 803 [313 P.2d 568]; *Pacific Employers Ins. Co.* v. *City of Berkeley* (1984) 158 Cal.App.3d 145, 152 [204 Cal.Rptr. 387]; *Southern Cal. First Nat. Bank* v. *Olsen* (1974) 41 Cal.App.3d 234, 241 [116 Cal.Rptr. 4].)

It long has been settled in California that where a bond incorporates another contract by an express reference thereto, "the bond and the contract

---

[3]Although the bank was a co-obligee under the bond, it is not a party in these proceedings.

should be read together and construed fairly and reasonably as a whole according to the intention of the parties." (*Roberts* v. *Security T. & S. Bank, supra,* 196 Cal. at p. 566; see *Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co.* (1995) 31 Cal.App.4th 1458, 1462 [37 Cal.Rptr.2d 563].) To ascertain the nature and extent of the liability to which the surety has bound itself, courts must "examine the language of the undertaking by the light of the [construction] agreement, faithful performance of the terms of which it guarantees." (*Roberts* v. *Security T. & S. Bank, supra,* 196 Cal. at pp. 566-567; see *Ryan* v. *Shannahan* (1930) 209 Cal. 98, 102 [285 P. 1045]; *Pacific Employers Ins. Co.* v. *City of Berkeley, supra,* 158 Cal.App.3d at pp. 150-151.) As a general rule, "[t]he obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal . . . ." (Civ. Code, § 2809.)

In this case, the construction contract between Cates and Talbot explicitly contemplated that all time limits specified therein were "of the essence of the Contract." That time was a critical factor was further evidenced in a contractual clause specifying, among other things, that "no course of conduct or dealings between the parties, nor express or implied acceptance of alterations or additions to the Work . . . shall be the basis for any . . . change in the Contract Time." The contract further stipulated that, upon Talbot's request, Cates was required to obtain a performance bond in the full amount of the contract sum ($3.9 million) "as security for the faithful performance of the Contract Documents."

The performance bond given by Transamerica stated in clear terms that Cates (as principal) and Transamerica (as surety) agreed to be "held and firmly bound unto" Talbot (as obligee) in the amount of $3.9 million, for the payment whereof Cates and Transamerica agreed to bind themselves "jointly and severally" by the bond. The bond, which expressly referred to the contract between Cates and Talbot and "by reference made [it] a part [t]hereof," declared that the condition of the obligation assumed by Transamerica "is such that, if [Cates] shall *promptly and faithfully perform said Contract,* then this obligation shall be null and void; otherwise it shall remain *in full force and effect.*" (Italics added.) The bond further provided: "Whenever [Cates] shall be, and declared by [Talbot] to be in default under the Contract, [Talbot] having performed [Talbot]'s obligations thereunder, [Transamerica] may promptly remedy the default, or shall promptly [¶] 1) Complete the Contract *in accordance with its terms and conditions,* or [¶] 2) Obtain a bid or bids for completing the Contract *in accordance with its terms and conditions,* and . . . arrange for a contract between such bidder and [Talbot], and make available as Work progresses . . . sufficient funds to pay

the cost of completion less the balance of the contract price; but not exceeding, *including other costs and damages for which the Surety may be liable hereunder*, the amount set forth in the first paragraph hereof [$3.9 million]." (Italics added.)

Taken together as a whole, the bond and underlying construction contract are fairly and reasonably read as requiring Transamerica to answer for damages suffered by Talbot as a direct result of Cates's failure to promptly and faithfully perform the contract. Although the bond did not explicitly mention the subject of delay damages, Transamerica knew from the construction contract, which had been "made a part" of the bond, that time was "of the essence" of the contract and that the bond's purpose was to provide security for the "faithful" performance of the contract in the event of Cates's default. The bond itself made clear that Transamerica's obligation would become "null and void" only if Cates were to "promptly and faithfully perform said Contract." And notably, the bond specifically called for Transamerica, if the default was not remedied, to either complete or arrange for completion of the contract "in accordance with its terms and conditions"— without providing for any exceptions. From such language the parties reasonably could expect that failure to complete the project by the agreed deadline would affect Transamerica's liability to Talbot under the bond.[4] Finally, the bond's reference to "other costs and damages for which the Surety may be liable hereunder" also reflected an understanding that the bond contemplated Transamerica's liability for damages.

Courts in California have not hesitated to find sureties contractually liable for damages attributable to their principals' delay in performing construction contracts. (E.g., *Bird* v. *American Surety Co.* (1917) 175 Cal. 625, 631 [166 P. 1009]; *Tally* v. *Ganahl* (1907) 151 Cal. 418, 424 [90 P. 1049]; *Pacific Employers Ins. Co.* v. *City of Berkeley, supra*, 158 Cal.App.3d at pp. 150-152 [surety liable for liquidated damages which included amounts occasioned by a principal's delay]; *Amerson* v. *Christman* (1968) 261 Cal.App.2d 811, 825 [68 Cal.Rptr. 378]; accord, *Downingtown School Dist.* v. *Intern. Fid.* (Pa.Commw.Ct. 1996) 671 A.2d 782, 786 [finding that similar bond language may support surety's liability for delay damages].)

Transamerica, however, argues we should adopt the reasoning in *American Home Assur. Co.* v. *Larkin Gen. Hosp.* (Fla. 1992) 593 So.2d 195 (*American Home*), which held that a surety could not be held liable for delay

---

[4] The "terms and conditions" language in the bond undermines Transamerica's claim that the bond incorporated the construction contract simply to identify the project it would have to complete if Cates were to default.

damages unless the bond explicitly so provides. In *American Home*, the Florida Supreme Court expressed the view that the usual purpose of a performance bond is only to ensure the completion of the construction contract upon the contractor's default. (593 So.2d at p. 198.) In light of that perceived limited purpose, the court construed bond language that obligated the surety to either complete the project or pay the reasonable costs of completion as "clearly explain[ing] that the performance bond merely guaranteed the completion of the construction contract and nothing more." (*Ibid.* [rejecting analysis of *Amerson* v. *Christman, supra*, 261 Cal.App.2d 811].)

Even assuming, for purposes of argument, that the performance bond in *American Home* contained language substantially similar to the bond at issue here, we are not persuaded. The Florida court appears to have viewed the purpose of a performance bond narrowly and to have determined the surety's obligations without reference to the underlying construction contract.[5] While that may reflect the rule in Florida (cf. *L & A Contracting* v. *Southern Concrete Services* (5th Cir. 1994) 17 F.3d 106, 112, fn. 23 [commenting that *American Home* did not turn on the language of the particular bond, but rather stated what was obviously intended to be a general proposition of law]), firmly established California precedent holds otherwise. (*Ryan* v. *Shannahan, supra*, 209 Cal. at p. 102; *Roberts* v. *Security T. & S. Bank, supra*, 196 Cal. at pp. 566-567; *Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co., supra*, 31 Cal.App.4th at p. 1462; *Pacific Employers Ins. Co.* v. *City of Berkeley, supra*, 158 Cal.App.3d at pp. 150-151.)

Transamerica further suggests that if Talbot had wanted a guarantee covering Cates's delay, then it could and should have used another available standard form of bond expressly stating that the surety would pay "damages caused by delayed performance or nonperformance of the Contractor." (See Am. Inst. Architects, AIA doc. No. A312.) Here, however, the terms of the bond and the incorporated construction contract reflected such a guarantee. That the precise language of the foregoing form was not used is of no consequence.[6]

---

[5]Hence, the court did not note whether the underlying contract specified that time was of the essence or whether such a clause would have been significant.

[6]Indeed, we note there are other available standard bond forms that purport to assure performance of the work contracted between a general contractor and an owner ("work performance" bonds) without necessarily guaranteeing that the underlying contract will be performed promptly and faithfully. (See Conners, Cal. Surety and Fidelity Bond Practice (Cont.Ed.Bar 1969) § 2.5, p. 18 (Conners) [compare example A ("Performance of Contract" bond) with example B ("Performance of Work" bond)]; *id.*, §§ 7.1, 7.5, pp. 61, 66 [a work performance bond is the "most limited form of performance bond" because it "guarantees that the *work* will be performed" but "does not guarantee that the principal will perform each and

## B.  Breach of the Implied Covenant of Good Faith and Fair Dealing

### 1.  Current California Law Regarding Tort Remedies for Breach

By now it is well established that a covenant of good faith and fair dealing is implicit in every contract. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*); *Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 940 [132 Cal.Rptr. 424, 553 P.2d 584]; *Brown* v. *Superior Court* (1949) 34 Cal.2d 559, 564 [212 P.2d 878].) The essence of the implied covenant is that neither party to a contract will do anything to injure the right of the other to receive the benefits of the contract.[7] (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 460 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Brown* v. *Superior Court, supra*, 34 Cal.2d at p. 564.)

Because the covenant of good faith and fair dealing essentially is a contract term that aims to effectuate the contractual intentions of the parties, "compensation for its breach has almost always been limited to contract rather than tort remedies." (*Foley, supra*, 47 Cal.3d at p. 684; see *Freeman & Mills, Inc.* v. *Belcher Oil Co.* (1995) 11 Cal.4th 85, 94 [44 Cal.Rptr.2d 420, 900 P.2d 669]; *Hunter* v. *Up-Right, Inc.* (1993) 6 Cal.4th 1174, 1180 [26 Cal.Rptr.2d 8, 864 P.2d 88] (*Hunter*).) At present, this court recognizes only one exception to that general rule: tort remedies are available for a breach of the covenant in cases involving insurance policies. (*Hunter, supra*, 6 Cal.4th at pp. 1180-1181; *Foley, supra*, 47 Cal.3d at p. 684.) In the insurance policy setting, an insured may recover damages not otherwise

---

every term of the contract"]; Sobel, *Owner Delay Damages Chargeable to Performance Bond Surety* (1984) 21 Cal. Western L.Rev. 128, 131 (Sobel) [The work performance bond "is narrower than the usual bond guaranteeing faithful performance of the contract because it does not necessarily guarantee that the principal will perform each and every term of the contract." (Fn. omitted.)].) Had the parties agreed to a bond with language more similar to a work performance bond, Transamerica's arguments for a narrow construction of its obligations may have had more force. (But see *Pacific Employers Ins. Co.* v. *City of Berkeley, supra*, 158 Cal.App.3d 145 [finding that a work performance bond that expressly referred to and incorporated a construction contract containing a liquidated damages clause was sufficient to allow recovery against the surety for liquidated damages occasioned by the principal's delay].)

In light of our conclusion that Transamerica may be held liable for Cates's delay, we need not decide whether the award of damages may be upheld on the alternative ground that Transamerica's breaches of the performance bond caused the damages at issue.

[7]Although an obligee certainly qualifies as an intended beneficiary of a bond where, as here, the bond names the obligee and confers upon the obligee a right of action on the bond, the obligee is not, strictly speaking, a party to the bond. Here, Transamerica has not argued that such circumstance bars Talbot from asserting a cause of action for breach of the covenant of good faith and fair dealing. .

available in a contract action, such as emotional distress damages resulting from the insurer's bad faith conduct (see *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 580 [108 Cal.Rptr. 480, 510 P.2d 1032]) and punitive damages if there has been oppression, fraud, or malice by the insurer (see Civ. Code, § 3294).

As our decisions acknowledge, tort recovery in this particular context is considered appropriate for a variety of policy reasons. Unlike most other contracts for goods or services, an insurance policy is characterized by elements of adhesion, public interest and fiduciary responsibility. (*Foley*, *supra*, 47 Cal.3d at pp. 684-685, citing *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 820 [169 Cal.Rptr. 691, 620 P.2d 141] (*Egan*); see *Barrera* v. *State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659, 668, fn. 5 [79 Cal.Rptr. 106, 456 P.2d 674].) In general, insurance policies are not purchased for profit or advantage; rather, they are obtained for peace of mind and security in the event of an accident or other catastrophe. (See *Foley*, *supra*, 47 Cal.3d at p. 684; *Egan*, *supra*, 24 Cal.3d at p. 819; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 434 [58 Cal.Rptr. 13, 426 P.2d 173].) Moreover, an insured faces a unique "economic dilemma" when its insurer breaches the implied covenant of good faith and fair dealing. (*Foley*, *supra*, 47 Cal.3d at p. 692.) Unlike other parties in contract who typically may seek recourse in the marketplace in the event of a breach, an insured will not be able to find another insurance company willing to pay for a loss already incurred. (*Ibid.*)

In addition, we have observed that the tort duty of a liability insurer ordinarily is based on its assumption of the insured's defense and of settlement negotiations of third party claims. (*Crisci* v. *Security Ins. Co.*, *supra*, 66 Cal.2d at p. 432, fn. 3.) The assumption of those responsibilities obligates the insurer to give at least as much consideration to the welfare of its insured as it gives to its own interests so as not to deprive the insured of the benefits of the insurance policy. (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659 [328 P.2d 198, 68 A.L.R.2d 883]; see *Egan*, *supra*, 24 Cal.3d at p. 818.)

Significantly, this court has never recognized the availability of tort remedies for breaches occurring in the context of a construction performance bond or any other so-called "contract of suretyship." (See *Pacific M. & T. Co.* v. *Bonding & Ins. Co.* (1923) 192 Cal. 278, 285 [219 P. 972] [a bond given to guarantee the faithful performance of a contract is a "contract of suretyship"].) It appears only three Court of Appeal decisions—*General Ins. Co.* v. *Mammoth Vista Owners' Assn.* (1985) 174 Cal.App.3d 810 [220

Cal.Rptr. 291] (*Mammoth Vista*), *Pacific-Southern Mortgage Trust Co.* v. *Insurance Co. of North America* (1985) 166 Cal.App.3d 703 [212 Cal.Rptr. 754] (*Pacific-Southern*) and *Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072 [234 Cal.Rptr. 835] (*Downey*)—have addressed tort claims in the suretyship setting. Those cases, however, provide little guidance.

In *Mammoth Vista*, the only one of the three decisions that involved a construction performance bond, the Court of Appeal determined that a surety was subject to liability in tort for violations of Insurance Code section 790.03, subdivision (h), which prohibits unfair and deceptive claims settlement practices in the business of insurance. *Mammoth Vista* does not aid Talbot's position. In the first place, *Mammoth Vista* expressly refrained from deciding whether a surety is subject to a common law tort action for breach of the covenant of good faith and fair dealing. (See 174 Cal.App.3d at pp. 822-827.) Second, the availability of tort recovery in the insurance policy cases derives from policy considerations pertaining to the particular characteristics of such contracts and the relationship between the contracting parties; it has never been predicated upon the existence of legislation regulating the insurance business.[8] Finally, *Mammoth Vista*'s reasoning has been undermined by *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58], which held that Insurance Code section 790.03, subdivision (h), does not create a private cause of action in tort against insurers who commit the unfair practices enumerated in that provision.

The other two decisions, *Pacific-Southern, supra,* 166 Cal.App.3d 703, and *Downey, supra,* 189 Cal.App.3d 1072, likewise are unhelpful. Both cases involved fidelity bonds, not performance bonds, and the appellate courts there simply found sufficient evidence of bad faith or malicious conduct by the defendant sureties. (*Pacific-Southern, supra,* 166 Cal.App.3d

---

[8]In *Mammoth Vista*, the Court of Appeal remarked that the actionable wrong contained in Insurance Code section 790.03, subdivision (h), was "merely a codification of the tort of breach of the implied covenant of good faith and fair dealing as applied to insurance." (174 Cal.App.3d at p. 822.) This and other courts have recognized, however, that the statute does not mirror the common law. (E.g., *Coleman* v. *Gulf Ins. Group* (1986) 41 Cal.3d 782, 795 [226 Cal.Rptr. 90, 718 P.2d 77, 62 A.L.R.4th 1083] [holding that a third party claimant could not maintain a breach of covenant cause of action against an insurer even though *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329] had construed Ins. Code, § 790.03, subd. (h), to allow third party actions against insurers for unfair claims handling and settling practices]; *Zephyr Park* v. *Superior Court* (1989) 213 Cal.App.3d 833, 838 & fn. 6 [262 Cal.Rptr. 106] [noting that actions formerly permitted under Ins. Code, § 790.03, subd. (h), in some circumstances provided a basis for relief which would not have existed under a common law bad faith claim, even as to first party claims].)

at pp. 715-716; *Downey, supra,* 189 Cal.App.3d at pp. 1096-1097.) While both decisions recited the general rule that insurers acting unreasonably and in bad faith toward their insureds are subject to liability in tort, the courts apparently assumed, in the absence of litigation on the point, that the foregoing rule applied in the context of fidelity bonds. ■ Fidelity bonds, however, are two-party contracts between an insurer and an employer that protect against employee dishonesty. It is generally recognized that fidelity bonds resemble traditional contracts of insurance more than surety bonds involving a tripartite relationship between a surety, a principal and an obligee. (See 6 Levy et al., Cal. Torts (1998) § 81.33[3], p. 81-131; 1 Couch on Insurance (3d ed. 1995) §§ 1:13, 1:16, pp. 1-25, 1-29 (Couch) [fidelity bond "is essentially one of indemnity for the personal loss to the employer" (fns. omitted)].)

■ It is firmly established that the insurance policy cases represent " 'a major departure from traditional principles of contract law.' " (*Freeman & Mills, Inc.* v. *Belcher Oil Co., supra,* 11 Cal.4th at p. 94, citing *Foley, supra,* 47 Cal.3d at p. 690.) Thus, we have cautioned courts to exercise great care in considering whether to extend " 'the exceptional approach taken in those cases' to 'another contract setting.' " (11 Cal.4th at p. 94.) ■ In *Foley, supra,* 47 Cal.3d 654, this court rejected the concept of tort recovery for an employer's breach of the implied covenant of good faith and fair dealing. We concluded that "the employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies in view of the countervailing concerns about economic policy and stability, the traditional separation of tort and contract law, and . . . the numerous protections against improper terminations already afforded employees." (*Id.* at p. 693.)[9]

■ The question here is whether the exceptional approach thus far reserved for breaches in the insurance policy setting should be extended to

[9]Subsequent to *Foley,* the Courts of Appeal have considered this issue in a variety of settings and have unanimously refused to sanction tort remedies outside the context of an insurance policy. (E.g., *Copesky* v. *Superior Court* (1991) 229 Cal.App.3d 678 [280 Cal.Rptr. 338] [bank/depositor], overruling its prior holding in *Commercial Cotton Co.* v. *United California Bank* (1985) 163 Cal.App.3d 511 [209 Cal.Rptr. 551] (*Commercial Cotton*); *Careau & Co.* v. *Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371 [272 Cal.Rptr. 387] [bank/commercial borrower]; *Trustees of Capital Wholesale Electric etc. Fund* v. *Shearson Lehman Brothers, Inc.* (1990) 221 Cal.App.3d 617 [270 Cal.Rptr. 566] [stockbroker/investor]; *Price* v. *Wells Fargo Bank* (1989) 213 Cal.App.3d 465 [261 Cal.Rptr. 735] [bank/loan customers], criticizing *Commercial Cotton, supra,* 163 Cal.App.3d 511, and *Barrett* v. *Bank of America* (1986) 183 Cal.App.3d 1362 [229 Cal.Rptr. 16]; *Martin* v. *U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396 [251 Cal.Rptr. 17] [involving dealership contract]; see generally, *Careau & Co.* v. *Security Pacific Business Credit, Inc., supra,* 222 Cal.App.3d at p. 1399, fn. 25 [listing additional decisions where tort remedies were denied].)

breaches in the context of a surety bond given to assure performance on a construction contract.[10] Talbot argues, in essence, that a performance bond is a form of insurance and that breaches in the performance bond context justify the same extraordinary remedies that are available in insurance policy cases. Transamerica, on the other hand, argues that performance bonds are fundamentally different from insurance policies and fail to warrant similar treatment. We proceed to consider these points.

### 2. *Inclusion of Suretyship in the Insurance Code*

As Talbot correctly observes, "Surety" is listed as a separate class of insurance under the Insurance Code. (Ins. Code, § 100, subd. (5).) Performance bonds are listed within that class. (Ins. Code, § 105, subd. (a).)[11]

The Insurance Code defines "Insurance" to mean "a contract whereby one undertakes to *indemnify* another against loss, damage, or liability arising from a contingent or unknown event." (Ins. Code, § 22, italics added; see also *id.*, § 23 [defining "insurer" as the "person who undertakes to indemnify another by insurance" and "insured" as "the person indemnified"].) In contrast, a surety bond is a contract whereby one promises to answer for the debt, default, or miscarriage of another. (Civ. Code, § 2787; Cal. Code Regs., tit. 10, § 2695.1, subd. (c); *Washington Internat. Ins. Co.* v. *Superior Court* (1998) 62 Cal.App.4th 981, 989 [73 Cal.Rptr.2d 282], citing *Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co., supra*, 31 Cal.App.4th at p. 1464.) Therefore, a surety's posture as to an obligee on a performance bond is not necessarily one of "indemnitor." (See *Leatherby Ins. Co.* v. *City of Tustin* (1977) 76 Cal.App.3d 678, 686-687 [143 Cal.Rptr. 153]; cf. *Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co., supra*, 31 Cal.App.4th at p. 1464 [bond ensuring payment for airline tickets not equivalent to a liability insurance policy].)

Although surety is included within the Insurance Code as a class of insurance, it long has been settled that the parties in surety arrangements

---

[10]Surety contracts take a number of different forms. In addition to construction bonds and fidelity bonds, another common form of surety contract is a loan guarantee, whereby one person (the surety or guarantor) essentially agrees to answer for the default of another (the principal) to a lender (the obligee). Bonds also are required for the protection of the public in various private industries and occupations, as well as for notary publics and applicants for certain public agencies or positions. We restrict our analysis in this case to the subject of construction performance bonds.

[11]Insurance Code section 105, subdivision (a), states that surety insurance includes "[t]he guaranteeing of behavior of persons and the guaranteeing of performance of contracts (including executing or guaranteeing bonds and undertakings required or permitted in all actions or proceedings or by law allowed), *other than insurance policies* and other than for payments secured by a mortgage, deed of trust, or other instrument constituting a lien or charge on real estate." (Italics added.)

have certain rights and defenses that do not attend the typical insurance relationship. For instance, an insurer generally has no right of subrogation against the insured for covered losses even if the insured's negligence contributed to such losses. A surety, however, is entitled to reimbursement from its principal for amounts paid to the obligee upon the principal's default.[12] (Civ. Code, §§ 2847, 2848; *Washington Internat. Ins. Co.* v. *Superior Court, supra,* 62 Cal.App.4th at p. 989; see *Schmitt* v. *Insurance Co. of North America, supra,* 230 Cal.App.3d at pp. 256-257.) Moreover, a surety is entitled to assert as defenses to payment of a surety bond all defenses available to its principal (Civ. Code, § 2810; *U.S. Leasing Corp.* v. *duPont* (1968) 69 Cal.2d 275, 290 [70 Cal.Rptr. 393, 444 P.2d 65] ["where the principal is not liable on the obligation, neither is the guarantor"]; *Flickinger* v. *Swedlow Engineering Co.* (1955) 45 Cal.2d 388, 394 [289 P.2d 214]), as well as its own independent defenses (e.g., Civ. Code, § 2819 [allowing exoneration of a surety "if by any act of the creditor [obligee], without the consent of the surety the original obligation of the principal is altered in any respect"]). The unique substantive aspects of surety relationships and surety bonds are addressed in a number of Civil Code provisions. (See Civ. Code, §§ 2787-2856 [rights and duties of sureties generally].)

Courts have found these and other distinctions relevant in a variety of contexts. One court, for instance, determined that the public policy of denying insurance coverage for willful wrongs (Ins. Code, § 533) is not offended by requiring a surety on a public works payment bond to pay an interest penalty based on the contractor's conduct. (*Washington Internat. Ins. Co.* v. *Superior Court, supra,* 62 Cal.App.4th at pp. 989-990.) Another concluded that a surety has no duty to protect the principal under a motor vehicle dealer's bond as if the principal were an insured under an insurance policy. (*Schmitt* v. *Insurance Co. of North America, supra,* 230 Cal.App.3d at p. 258.) A third court held that a particular performance bond ensuring payment for airline tickets was not equivalent to a liability insurance policy that covered theft losses. (*Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co., supra,* 31 Cal.App.4th at p. 1464.) ▆ Thus, while surety is listed as a class of insurance for regulatory purposes, there is no doubt that it "differs in material respects" from other forms of insurance. (*Amwest Surety Ins. Co.* v. *Wilson* (1995) 11 Cal.4th 1243, 1260 [48 Cal.Rptr.2d 12, 906 P.2d 1112] (*Amwest*); see generally, 1 Couch, *supra,* § 1:18, p. 1-31; 1 Cal. Insurance Law & Practice (1998) § 1.01[4], p. 1-9 (California Insurance Law).)

---

[12]Although sureties have a right of reimbursement implied by law (see Civ. Code, §§ 2847, 2848), they frequently execute written contracts of indemnification with their principals, as was done in this case.

Consistent with the Civil Code and the case law, regulations promulgated pursuant to the Insurance Code make special note of the "unique relationship which exists under a surety bond between the insurer [surety], the obligee or beneficiary, and the principal." (Cal. Code Regs., tit. 10, § 2695.1, subd. (c).) They also are explicit in distinguishing suretyship from traditional insurance: "In contrast to other classes of insurance, surety insurance involves a promise to answer for the debt, default or miscarriage of a principal who has the primary duty to pay the debt or discharge the obligation and who is bound to indemnify the insurer." (*Ibid.*; see also Cal. Code Regs., tit. 10, § 2695.2, subd. (j) [defining "[i]nsurance policy" to exclude "surety bond" or "bond"].)

In recognition of the distinctions between suretyship and traditional insurance, the regulations exempt sureties from the set of standards promoting the prompt, fair and equitable settlement of claims by insurers and instead provide that sureties are governed by a separate set of claims handling and settlement standards. (Cal. Code Regs., tit. 10, § 2695.1, subd. (c).) While some of the standards relevant to sureties are identical or similar to those applicable to insurers (e.g., Code Cal. Regs., tit. 10, § 2695.10, subd. (a) [prohibiting discriminatory claims settlement practices]); *id.*, subd. (c) [requiring written notice to claimants of need for additional time to determine whether a claim should be accepted or denied]; *id.*, subd. (d) [requiring diligent investigation of a claim]), sureties have been excepted from many of those standards. For instance, since a surety typically must sort through the conflicting claims of the principal and the obligee, regulatory standards do not hold a surety to the same 40-day period applicable to insurers for accepting or denying claims but recognize that substantially more time may be appropriate. (Compare Cal. Code Regs., tit. 10, § 2695.7, subd. (b) [40 days for insurers] with *id.*, § 2695.10, subd. (b) [60 days for sureties].) More significantly, a surety is not subject to the standard prohibiting insurers from attempting to settle a claim by making a settlement offer that is "unreasonably low." (Compare Cal. Code Regs., tit. 10, § 2695.7, subd. (g) with *id.*, § 2695.10.) In addition, a surety is not subject to the standard requiring insurers to provide written notice to unrepresented claimants of any statute of limitation or other time period requirement that may be used to defeat a claim. (Compare Cal. Code Regs., tit. 10, § 2695.7, subd. (f) with *id.*, § 2695.10.)

Despite the fact that surety bonds have been distinguished from insurance policies in statutory, regulatory and decisional law, Talbot argues, in effect, that tort remedies for breaches in the performance bond setting are appropriate simply because surety bonds are categorized and regulated as a class

of insurance under the Insurance Code. (See Ins. Code, §§ 100, subd. (5), 105, subd. (a).) We disagree.

As one text in the surety field has observed, "[t]he inclusion of suretyship in the Insurance Code is derived from the need for control of the surety business by a state agency and does not imply that the underlying natures of insurance and suretyship are the same." (Conners, *supra*, § 1.4, p. 6.) ▇▇ ▪ ▪ The legislative branch is free to regulate suretyship, and, assuming a rational basis, may require sureties and surety bonds to adhere to the same regulations and requirements that apply to insurers and insurance policies.[13] ▇ Case law makes clear, however, that tort remedies for breach of the implied covenant are permitted in the insurance policy setting for policy reasons pertaining to the distinctive nature of such contracts and the relationship between the contracting parties. (See *Foley, supra,* 47 Cal.3d at pp. 684-685; *Egan, supra,* 24 Cal.3d at p. 819; *Careau & Co. v. Security Pacific Business Credit, Inc., supra,* 222 Cal.App.3d at pp. 1395-1399; *Mitsui Manufacturers Bank v. Superior Court* (1989) 212 Cal.App.3d 726, 730-731 [260 Cal.Rptr. 793].) Little, if any, significance has been placed on the circumstance that insurers are licensed by the Insurance Commissioner and are subject to Insurance Code regulations.[14] ▇ Moreover, while insurers are subject to administrative sanctions for violating statutory prohibitions against unfair and deceptive claims settlement practices (see Ins. Code,

[13]Generally, insurance regulation is designed to serve one or more of three main objectives: (1) to discourage overreaching by insurers, principally with regard to marketing practices and arrangements (e.g., rebating, discrimination); (2) to assure the solvency (or solidity) of insurers and to guard against the consequences of an insurer's imprudent management of its resources; and (3) to assure equitable rating classifications that will produce equitable premium charges for individual purchasers while providing the insurers with a fair return for the risks undertaken. (Keeton & Widiss, Insurance Law (1988) Insurance Regulation, § 8.2(a), pp. 938-939 (Keeton & Widiss).)

[14]Talbot places much emphasis on a footnote in *Amwest, supra,* 11 Cal.4th 1243, in which we commented that "[s]urety bonds generally are considered a form of casualty insurance." (11 Cal.4th at p. 1249, fn. 5, citing Keeton & Widiss, *supra,* § 1.5(d), p. 27.) That footnote, however, offers no guidance on the issue whether surety bonds, like insurance policies, warrant tort remedies for breach of the implied covenant. *Amwest* concerned a voter-enacted initiative measure that added rate regulation provisions to the Insurance Code; we concluded the Legislature exceeded its authority in attempting to exempt surety companies from those provisions because such an exemption did not further the purposes of the measure. In relying upon the Keeton & Widiss treatise's observation that casualty insurance encompasses surety bonds, we did not disagree with the treatise's additional observation that the meaning of the term "casualty insurance" has been expanded far beyond its traditional sense. (See Keeton & Widiss, *supra,* § 1.5(d), p. 27; see also *id.,* § 8.3(a), p. 942 & fn. 1.) But even though *Amwest* concluded that the initiative measure had broad application, that circumstance does not control the inquiry here. We have emphasized repeatedly that contractual relationships may give rise to tort liability only in *exceptional* circumstances. (See *Freeman & Mills, Inc. v. Belcher Oil Co., supra,* 11 Cal.4th at p. 94; *Foley, supra,* 47 Cal.3d at p. 690.)

§§ 790.03, subd. (h), 790.035, 790.05, 790.07, 790.09), statutory violations do not give rise to a private right of action for tort damages. (*Moradi-Shalal v. Fireman's Fund Ins. Companies, supra,* 46 Cal.3d 287.)

      In assessing whether the availability of tort remedies should turn on the Insurance Code's inclusion of surety contracts as a class of insurance, we are guided by *Estate of Barr* (1951) 104 Cal.App.2d 506 [231 P.2d 876] (*Barr*) and *In re Pikush* (Bankr. 9th Cir. 1993) 157 B.R. 155, affd. (9th Cir. 1994) 27 F.3d 386 (*Pikush*). Those decisions held that the inclusion of a particular contract in the Insurance Code for regulatory purposes does not require its classification as insurance for other purposes.

In *Barr, supra,* 104 Cal.App.2d 506, the issue was whether the proceeds of an annuity contract paid by an insurance company to the named beneficiary on the death of the annuitant qualified under California's insurance exemption to inheritance taxation as provided in the Revenue and Taxation Code.[15] Even though section 101 of the Insurance Code explicitly described the term "life insurance" as including "the granting, purchasing, or disposing of annuities," the *Barr* court recognized that resolution of the exemption question turned on the construction of the Revenue and Taxation Code, which used the terms "insurance policies" and "life insurance" without reference to annuity contracts: "The classification of annuities as life insurance for the purposes of the Insurance Code does not require its classification as insurance for the purposes of the Revenue and Taxation Code, the objects of which are totally different." (104 Cal.App.2d at p. 511; see also *Helvering* v. *Le Gierse* (1941) 312 U.S. 531 [61 S.Ct. 646, 85 L.Ed. 996] [reaching a similar conclusion in connection with the federal estate tax exemption].)

Similarly, the United States Bankruptcy Appellate Panel of the Ninth Circuit determined in *Pikush, supra,* 157 B.R. 155, that a debtor under chapter 7 of the Bankruptcy Code could not claim three single-premium annuity contracts as exempt insurance policies pursuant to Code of Civil Procedure section 704.100, subd. (c). Relying in part on *Barr, supra,* 104 Cal.App.2d 506, the appellate panel found that the circumstance that the Insurance Code "chooses to license and regulate the 'granting, purchasing, or disposing' of annuities in a certain manner should have no bearing on the interpretation of California's [debtor] exemption laws." (*Pikush, supra,* 157 B.R. at p. 159.)

---

[15]As quoted by *Barr,* the relevant code provisions defined "[i]nsurance policy" to mean "a life or accident insurance policy the proceeds of which are payable by reason of the death of the insured" (Rev. & Tax. Code, former § 13721) and provided that payments of the proceeds from insurance policies were exempt from inheritance taxes, subject to certain limitations (*id.,* former §§ 13723, 13724). (*Barr, supra,* 104 Cal.App.2d at pp. 507-508, fn. *.)

The same reasoning applies here with equal force. Although suretyship is listed in the Insurance Code as a class of insurance, it does not follow that a surety bond equates to a policy of insurance under the common law or common law theories of liability. Nor does it follow that the unique policy reasons which justify extraordinary remedies in the insurance policy context are similarly implicated for bonds guaranteeing the performance of a commercial construction contract. In short, the mere inclusion of surety arrangements in the Insurance Code should not be determinative of the issue before us. Rather, we must evaluate whether the policy considerations recognized in the common law support the availability of tort remedies in the context of a performance bond. (*Foley*, *supra*, 47 Cal.3d at p. 693.)

### 3. *Policy Considerations*

As our decisions explain, tort recovery is considered appropriate in the insurance policy setting because such contracts are characterized by elements of adhesion and unequal bargaining power, public interest and fiduciary responsibility. (*Foley*, *supra*, 47 Cal.3d at pp. 684-685; *Egan*, *supra*, 24 Cal.3d at p. 820; see *Barrera* v. *State Farm Mut. Automobile Ins. Co.*, *supra*, 71 Cal.2d at p. 668, fn. 5.) We now consider whether construction performance bonds are marked by such elements.

#### a. *Adhesion and Unequal Bargaining Power*

Unlike the vast majority of insureds who must accept insurance on a "take-it-or-leave-it" basis, "obligees decide the form of the bond which they will accept from the principal, thus they can require terms which provide an incentive to the surety to timely pay claims, such as attorneys' fees and interest." (Shattuck, *Bad Faith: Does It Apply to Sureties in Alabama?* (1996) 57 Ala. Law. 241, 246 (Shattuck); see Conners, *supra*, § 1.5, p. 8; *Transamerica Premier* v. *Brighton School* (Colo. 1997) 940 P.2d 348, 354 (dis. opn. of Kourlis, J.).) If the obligee does not agree with the terms of the bond secured by the principal, it may consent to a modification of the underlying contract or may end bargaining altogether and seek a different principal whose financial resources and qualifications enable it to procure a bond with acceptable terms. (See generally, Comment, *Surety Contractors: Are Sureties Becoming General Liability Insurers?* (1990) 22 Ariz. St. L.J. 469, 484.) Hence, obligees generally possess ample bargaining power to negotiate for favorable bond terms.

Moreover, performance bonds typically incorporate the underlying construction contract, the terms and conditions of which have been negotiated by the principal and the obligee without any input from the surety. Because

the nature and extent of a surety's obligations under a performance bond are determined with reference to such terms and conditions (*Ryan* v. *Shannahan, supra,* 209 Cal. at p. 102; *Roberts* v. *Security T. & S. Bank, supra,* 196 Cal. at p. 566), bonds do not reflect the adhesion and unequal bargaining power that are inherent in insurance policies.[16]

Finally, many bonds, including the one at issue here, contain an express waiver of certain suretyship defenses, e.g., the right to notice of any alteration or extension of time made by the obligee. (See Civ. Code, § 2856; see Sobel, *supra,* 21 Cal. Western L.Rev. at p. 131 ["In most bonds today sureties waive notice of alterations or extensions of time for performance given by the owner to the contractor."].) Such waivers may effectively deprive the surety of protection against potentially harmful contractual modifications by the obligee. (See Sobel, *supra,* 21 Cal. Western L.Rev. at p. 132.)

Consideration of the foregoing factors leads us to conclude that, unlike an insurance policy, the typical performance bond bears no indicia of adhesion or disparate bargaining power that might support tort recovery by an obligee.

### b. *Public Interest and Fiduciary Responsibility*

Our decisions observe that tort remedies are appropriate for breaches in the insurance policy context because insureds generally do not seek to obtain commercial advantages by purchasing policies; rather, they seek protection against calamity. (See *Foley, supra,* 47 Cal.3d at p. 684; *Egan, supra,* 24 Cal.3d at p. 819; *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at p. 434.) But while the typical insurance policy protects an insured against accidental and generally unforeseeable losses caused by a calamitous or catastrophic event such as disability, death, fire, or flood, the general purpose of a construction performance bond "is to protect the creditor [the owner/obligee] against the danger that he will be unable to collect from the debtor [the general contractor/principal] for any failure in the performance of the contract." (*Regents of University of California* v. *Hartford Acc. & Indem. Co.* (1978) 21 Cal.3d 624, 639 [147 Cal.Rptr. 486, 581 P.2d 197]; see *Schmitt* v. *Insurance Co. of North America, supra,* 230 Cal.App.3d at p. 257 [the surety, in essence, " 'merely lends its credit so as to guarantee payment in the event

---

[16]It is of no significance that the bond terms here appeared on a standard form published by the American Institute of Architects (AIA). That organization, as its name suggests, is not one that exists to advance the interests of surety companies. The AIA generally promulgates its forms pursuant to an inclusive drafting policy that encourages input from a variety of outside groups and individuals. (See McCallum et al., *The 1996 Editions of AIA Design/Build Standard Form Agreements* (Oct. 1996) 16 Construction Law. 38.)

that the principal defaults' " on its contract]; 1 Cal. Insurance Law, *supra*, § 1.01[4], p. 1-10 [same].) In requiring a performance bond, then, the obligee "seeks the commercial advantage of obtaining a contract with the principal which provides additional financial security." (Shattuck, *supra*, 57 Ala. Law. at p. 246.)

In *Foley, supra*, 47 Cal.3d 654, this court indicated that insurance is a "quasi-public" service in the sense that individuals contract with insurance companies "specifically *in order to obtain protection from potential specified economic harm*." (*Id.* at p. 692.) While our words, read in isolation, might suggest that suretyship could qualify as a quasi-public service because a bond may be viewed as offering a form of economic protection, the context of our discussion indicates otherwise.

*Foley* emphasized that when an insurer in bad faith refuses to pay a claim or accept a settlement offer within policy limits, its insured cannot turn to the marketplace to find another insurance company willing to pay for losses already incurred. (47 Cal.3d at p. 692; see *Hunter, supra*, 6 Cal.4th at p. 1181.) Our discussion, however, distinguished that type of unique "economic dilemma" from the ordinary sort of situation in which breach of a commercial contract may have merely adverse financial significance to the nonbreaching party.[17] (*Foley, supra*, 47 Cal.3d at p. 692.) As another court put it, "[a] contracting party's unjustified failure or refusal to perform is a breach of contract, and cannot be transmuted into tort liability by claiming that the breach detrimentally affected the promisee's business." (*Arntz Contracting Co.* v. *St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 479 [54 Cal.Rptr.2d 888].)

Although a construction surety's breach of the implied covenant might very well have financial significance for a performance bond obligee, the obligee does not face the same economic dilemma as an insured. In contrast to an insured who typically can look only to the insurer for recovery in the event of a covered loss, an obligee also has a right of recovery against the principal. That right is not a hollow one, for unlike insurance, which contemplates the certainty of losses, sureties do not write performance bonds for principals who appear unable to perform the primary obligation and whose assets are insufficient to meet the contingency of default. (Conners, *supra*, § 1.4, pp. 6-7; Cushman, *Surety Bonds on Public and Private Construction Projects* (June 1960) 46 A.B.A. J. 649, 652-653; see Leo, *The*

---

[17]We gave the following example to illustrate our point: "If a small dealer contracts for goods from a large supplier, and those goods are vital to the small dealer's business, a breach by the supplier may have financial significance for individuals employed by the dealer or to the dealer himself." (*Foley, supra*, 47 Cal.3d at p. 692.) In such a situation, we concluded, permitting only contract damages remained appropriate. (*Id.* at pp. 692-693.)

*Construction Contract Surety and Some Suretyship Defenses* (1992-1993) 34 Wm. & Mary L.Rev. 1225, 1232 (Leo) ["contract bonds, like loans, are written based on the financial integrity of the principal, premised on the idea that no losses should follow" (fn. omitted)].) Accordingly, an obligee's right of recovery against a principal is, in most cases of default, a meaningful right.

In addition, an obligee may contract with others in the marketplace to obtain completion of its construction project and thereafter recover the reasonable cost of completion against the principal and the surety. (Cf. *Bacigalupi* v. *Phoenix Bldg. etc. Co.* (1910) 14 Cal.App. 632, 637 [112 P. 892].) In effect, then, a surety's breach of the implied covenant threatens to create no different a dilemma than that posed by the principal's default on the underlying construction contract.

Moreover, it is common for construction contracts to contain terms that protect an owner's construction funds. Owners and contractors generally structure their contracts to provide for installment payments to the contractor as the work progresses, typically as the work reaches specified stages of completion.[18] (See generally, 11 Cal.Jur.3d, Building and Construction Contracts, § 37, p. 54.) "This payment system adds incentive for the contractor to complete the work and reduces the risk of nonperformance for the owner. A percentage of funds held until completion of all of the work is called retainage and is intended both to reduce the risk of nonperformance by the contractor and to assure the completion of the work in accordance with the contract terms." (Leo, *supra*, 34 Wm. & Mary L.Rev. at p. 1238.) Progress payments and retainage serve to reduce both the owner's and the surety's risk. (*Ibid.*)

Thus, if an owner avoids overpaying the contractor as the project progresses, then the owner should have funds available to apply toward completion of the project in the event of the contractor's default.[19] Indeed, when the surety, pursuant to a bond, undertakes to complete the project itself or expends funds to enable another contractor to do so, the surety is entitled to reimbursement from the retainage. (See *Leatherby Ins. Co.* v. *City of*

---

[18]Here, Cates and Talbot executed a "Standard Form of Agreement Between Owner and Contractor" which provided for progress payments to Cates in 30-day intervals.

[19]In addition, a recently enacted statute provides that an owner has an unwaivable right to withhold from the final payment the statutory maximum of 150 percent of any amount subject to a bona fide dispute. (Civ. Code, § 3260; see generally, 11 Cal.Jur.3d, *supra*, Building and Construction Contracts, § 36, p. 54 [recognizing similar protections discussed in case law].) In this case, the contract between Cates and Talbot similarly contemplated the withholding of payments to Cates for Talbot's protection.

*Tustin, supra,* 76 Cal.App.3d at p. 685.) Likewise, if the surety fails to perform under the bond, the owner/obligee may, on its own, look to the marketplace to find a replacement contractor and use the unexpended sums to pay for that contractor's services. Even if, then, the original contractor defaults because of insolvency, an owner typically should have in its possession contract funds that roughly approximate the value of the uncompleted work. Consequently, it should not be common for an owner to confront the sort of economic dilemma that an insured faces after a catastrophic loss or accident, or for an owner to be particularly vulnerable to a surety's inaction.[20]

Contrary to Talbot's assertions, there is little basis for concluding that the relationship between a surety and an obligee is fiduciary or quasi-fiduciary in nature. Although a performance bond serves to shift the risk of the principal's nonperformance from the obligee to the surety, the conditional nature of the surety's obligations and its right to assert the defenses of the principal distinguish the surety-obligee relationship from the insurer-insured relationship. The fact that insurance regulations exempt sureties from many of the fair claims settlement standards applicable to issuers of insurance policies is consistent with and supports the conclusion that a surety does not stand in a fiduciary or quasi-fiduciary position with respect to an obligee. (Cal. Code Regs., tit. 10, § 2695.1, subd. (c); e.g., compare Cal. Code Regs., tit. 10, § 2695 subds. (f), (g) with *id.,* § 2695.10 [a surety is not obligated to notify an obligee of potential time-bar defenses and is not barred from making settlement offers that are "unreasonably low"].)

Additionally, a principal basis for recognizing tort liability in the context of liability insurance, i.e., the insurer's assumption of the insured's defense and of settlement negotiations of third party claims (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at p. 432, fn. 3; see *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d at p. 660), is not transferable to the performance bond setting. In contrast to a liability insurer, a surety bears no responsibility to defend an obligee against third party claims and has no right to represent the obligee's interests by virtue of the surety bond. Thus, to the extent such responsibilities give rise to fiduciary or quasi-fiduciary obligations in the liability insurance setting, their absence in surety arrangements supports a different result.

---

[20]It is true that an obligee may incur additional or increased costs in securing a replacement contractor. But such costs typically occur whenever a contract is breached and should not, either in the construction context or in any other context, be recognized as posing an economic dilemma.

### c. *Consequences of Allowing Tort Recovery*

In *Transamerica Premier* v. *Brighton School, supra*, 940 P.2d 348, the Colorado Supreme Court held that subjecting sureties to tort liability for breach of the implied covenant "compels commercial sureties to handle claims responsibly." (940 P.2d at p. 353.) The court also determined that, when a commercial surety withholds payment of an obligee's claim in bad faith, contract damages do not compensate for the surety's misconduct and have no deterrent effect to prevent such misconduct in the future. (*Ibid.*; see also *Dodge* v. *Fidelity & Deposit Co. of Md.* (1989) 161 Ariz. 344 [778 P.2d 1240, 1242-1243].) For the reasons set forth below, we are not convinced that tort remedies are necessary to achieve such objectives.

Unlike insureds, obligees possess ample bargaining power to negotiate terms that encourage timely performance of bond obligations and that provide for attorneys' fees and interest when breaches occur. (Shattuck, *supra*, 57 Ala. Law. at p. 246; Conners, *supra*, § 1.5, p. 8; *Transamerica Premier* v. *Brighton School, supra*, 940 P.2d 348, 354 (dis. opn. of Kourlis, J.).) Obligees may also require a liquidated damages provision to discourage nonperformance by sureties. Accordingly, tort remedies appear largely unnecessary to induce a surety's performance or to fully compensate for a surety's breach of the covenant of good faith.[21]

Moreover, it is generally recognized that a primary purpose of a performance bond is to protect the obligee against the risk of the principal's default on the construction contract. (See *Regents of University of California* v. *Hartford Acc. & Indem. Co., supra*, 21 Cal.3d at p. 639.) Where, as here, a bond is given to guarantee faithful performance of a construction contract, then contract remedies, which compensate for all damages within the contemplation of the parties at the time of contracting or at least reasonably foreseeable by them at that time (Civ. Code, § 3300), provide adequate compensation for breach of the bond.[22]

Nor are we persuaded that tort recovery is necessary to deter misconduct by sureties. As noted, owners and developers involved in construction wield sufficient bargaining power to demand contractual provisions for interest, attorney's fees and liquidated damages.

---

[21]Additionally, obligees prevailing in court may recover interest and costs pursuant to statute in appropriate circumstances. (E.g., Civ. Code, § 3287 [interest]; Code Civ. Proc., § 1032 [costs].)

[22]The instant case illustrates this point precisely. As indicated, Talbot was awarded over $3 million on its contract causes of action against Transamerica. The parties, however, stipulated that tort damages resulting from Transamerica's breach of the covenant of good faith and fair dealing amounted to only $1.

More importantly, the Insurance Code subjects sureties to substantial administrative sanctions and penalties for violations of the Unfair Trade Practices Act (Ins. Code, § 790 et seq.). Those sanctions include maximum civil penalties of $5,000 for each act or $10,000 for each willful act in violation of Insurance Code section 790.03, subdivision (h) (Ins. Code, § 790.035), and the issuance of cease and desist orders to enjoin further violations (*id.*, § 790.05). Willful violations of cease and desist orders may result in an additional penalty of $55,000, while repeated violations may result in the suspension or revocation of a surety's license for up to a year. (*Id.*, § 790.07.)

In considering the potential consequences of allowing tort remedies in the performance bond context, we are mindful of cases and commentary indicating that, for whatever benefits might accrue from permitting such remedies, harmful economic effects appear at least as likely to occur.

Unlike insurance relationships, which involve the interests of only two parties, the surety relationship is a tripartite one implicating the separate legal interests of the principal, the obligee and the surety. When contract disputes arise between an obligee and a principal as to whether the principal is in default, it may prove difficult for the surety to determine which party is in the right and whether its own performance is due under the bond. As one text explains: "There is no simple scenario for a performance bond dispute. Most often a dispute will involve claims, counterclaims, charges, and countercharges. Seldom will any one party be altogether in the right. Often the parties are in a defensive posture when bond claims begin to surface. Usually, the project is behind schedule. Generally, prior to the time the surety is officially called upon to perform, lines have been drawn and personalities have clashed. It is no wonder that performance bond claims are fertile fields for surety litigators." (Cushman & Stamm, Handling Fidelity and Surety Claims (1984) Performance Bonds, § 6.4, p. 168.)

As the foregoing suggests, construction disputes may be complicated enough to resolve when all three parties are on a level playing field. But it is rational to assume that making tort remedies available may encourage obligees to allege a principal's default more readily than they would in the absence of such remedies. It is also reasonable to conclude that allowing obligees to wield the club of tort and punitive damages may make it easier to pressure sureties into paying questionable default claims, or paying more on properly disputed claims, because the sureties will be reluctant to risk the outcome of a tort action. (See *Moradi-Shalal* v. *Fireman's Fund Ins. Companies*, *supra*, 46 Cal.3d at p. 301 [noting similar concerns in the context of

third party actions against insurers]; cf. *U.S. for Benefit of Ehmcke Sheet Metal* v. *Wausau* (E.D.Cal. 1991) 755 F.Supp. 906, 910-911 [finding the potential for unwarranted settlement demands and inflated settlements in the context of tortious breach actions premised upon federal Miller Act surety bonds].) Thus, permitting obligees to sue sureties in tort may allow obligees to gain additional leverage with sureties that principals do not have in contract disputes.

With such increased leverage, obligees will have sufficient power to detrimentally affect the interests of principals when disagreements arise during construction. Claims of default by the obligee may impair the principal's ability to secure bonding on other projects (see, e.g., *Arntz Contracting Co.* v. *St. Paul Fire & Marine Ins. Co.*, supra, 47 Cal.App.4th at p. 479), thus automatically disqualifying the principal from bidding on all public projects and many private ones. Moreover, indemnity agreements executed by principals often give sureties the right to pursue them for reimbursement of any loss, including legal expenses and the costs of investigation. In efforts to avoid bad faith liability, sureties may strive to "find" bond coverage for obligees while, at the same time, charging their investigation costs to the principal. Accordingly, even if the surety's investigation ultimately leads to the conclusion that the principal is not in default, the faultless principal may still suffer adverse consequences. These considerations, which have no parallel in disputes involving insurance policies, weigh against the recognition of extracontractual liability in the performance bond context.

Finally, allowing tort recovery in the construction bond context may open the door to increased (and sometimes successive) litigation, which in turn may increase the cost of obtaining bonds. For example, in *K-W Industries* v. *National Sur. Corp.* (1988) 231 Mont. 461 [754 P.2d 502], the subcontractor first sued in federal court on a payment bond under the Miller Act and then sued in Montana state court alleging violations of statutory prohibitions against bad faith insurance practices. But even if obligees bring their contract and tort actions in one suit, increased litigation and settlement costs are inevitable. Those costs ultimately would be passed on by contractors to obligees (see *U.S. for Benefit of Ehmcke Sheet Metal* v. *Wausau*, supra, 755 F.Supp. at pp. 910-911) and may contribute to the unaffordability of bonds.

### 4. *Authorities From Other States*

We observe that the Texas Supreme Court recently concluded that performance bond obligees should not be permitted to recover tort damages from commercial sureties for breaches of the implied covenant of good faith and

fair dealing. (*Great American Ins.* v. *N. Austin Utility* (Tex. 1995) 908 S.W.2d 415; cf. *U.S. for Benefit of Ehmcke Sheet Metal* v. *Wausau, supra,* 755 F.Supp. 906 [subcontractor may not sue surety in tort on a payment bond].)

As Talbot notes, however, courts in other jurisdictions have concluded otherwise. (*Transamerica Premier* v. *Brighton School, supra,* 940 P.2d 348; *Loyal Order of Moose* v. *Intern. Fidelity* (Alaska 1990) 797 P.2d 622; *Dodge* v. *Fidelity & Deposit Co. of Md., supra,* 778 P.2d 1240; *Szarkowski* v. *Reliance Ins. Co.* (N.D. 1987) 404 N.W.2d 502; cf. *K-W Industries* v. *National Sur. Corp., supra,* 754 P.2d 502 [subcontractor may sue surety in tort on a payment bond].)

After carefully reviewing the foregoing authorities, we find ourselves unpersuaded by the decisions that allow tort recovery, for they fail to give appropriate consideration to the material differences between insurance policies and performance bonds and the differing relations between the parties thereto. In addition, many of the decisions place undue emphasis upon statutes regulating suretyship as a class of insurance.

### 5. *Performance Bond Obligees May Not Recover in Tort*

The question before us is this: Is tort recovery appropriate for a breach of the implied covenant of good faith and fair dealing in the context of a construction performance bond? In answering that question, we are re-minded that "[c]ontract law exists to enforce legally binding agreements between parties; tort law is designed to vindicate social policy." (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514 [28 Cal.Rptr.2d 475, 869 P.2d 454].)

With that guiding principle in mind, we answer the question in the negative. A construction performance bond is not an insurance policy. Nor is it a contract otherwise marked by elements of adhesion, public interest or fiduciary responsibility, such that an extracontractual remedy is necessitated in the interests of social policy. Obligees have ample power to protect their interests through negotiation, and sureties, for the most part, are deterred from acting unreasonably by the threat of stiff statutory and administrative sanctions and penalties, including license suspension and revocation.

We acknowledge that our unwillingness to recognize a new tort action may mean that isolated instances of surety misconduct may yet occur. Nonetheless, in the absence of compelling policy reasons supporting tort recovery, we leave it up to the Legislature, which is better equipped to

gather data and study the effects of a significant shift in the balance of power between owner/obligees, contractor/principals and sureties, to determine whether statutorily authorized tort remedies would benefit the real estate development industry.

Accordingly, we hold that recovery for a surety's breach of the implied covenant of good faith and fair dealing is properly limited to those damages within the contemplation of the parties at the time the performance bond is given or at least reasonably foreseeable by them at that time. (See *Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at p. 515; Civ. Code, § 3300 [measure of damages for breach of an obligation arising from contract].)

## C. *Punitive Damages*

■ The law governing this subject has been aptly summarized as follows. "[P]unitive or exemplary damages, which are designed to punish and deter statutorily defined types of wrongful conduct, are available only in actions 'for breach of an obligation *not* arising from contract.' (Civ. Code, § 3294, subd. (a), italics added.) In the absence of an independent tort, punitive damages may not be awarded for breach of contract 'even where the defendant's conduct in breaching the contract was wilful, fraudulent, or malicious.' " (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at p. 516; see *Crogan* v. *Metz* (1956) 47 Cal.2d 398, 405 [303 P.2d 1029].)

Since Talbot may not recover in tort for Transamerica's breach of the implied covenant of good faith and fair dealing, the foregoing rule compels a reversal of the award of punitive damages in its entirety.

### Disposition

The judgment of the Court of Appeal is reversed insofar as it affirmed the award of tort damages for breach of the implied covenant and permitted an award of punitive damages. The matter is remanded to that court for further proceedings consistent with this opinion.

George, C. J., Chin, J., and Brown, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the majority's analysis of the contract damages question. I dissent, however, from their analysis of the availability of a tort remedy.

The majority explain at length what is unquestioned in the first instance: that "liability insurance is not identical in every respect with suretyship."

(*General Ins. Co.* v. *Mammoth Vista Owners' Assn.* (1985) 174 Cal.App.3d 810, 824 [220 Cal.Rptr. 291].) The question is whether the two forms of protection are sufficiently similar that a developer-obligee under a construction performance bond may hold the surety liable in tort for bad faith failure to honor its obligations under that bond. Most jurisdictions that have considered this question would reject the majority's view that they are not sufficiently similar. I do likewise.

## I

Though the majority do not appear particularly enthusiastic about the law that bad faith failure to perform an insurance contract is actionable in tort, they do not question that bedrock principle, which has been California law for many years. (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 429-430 [58 Cal.Rptr. 13, 426 P.2d 173]; *Hunter* v. *Up-Right, Inc.* (1993) 6 Cal.4th 1174, 1180 [26 Cal.Rptr.2d 8, 864 P.2d 88].)

Thus, it is beside the point whether, as they urge, insurance contracts are exceptional in giving the protected party a tort remedy if the protecting party acts in bad faith to fail to perform. All that is germane is whether this was an insurance contract. It was.

"Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (Ins. Code, § 22.) Surety insurance is one type of insurance. "Surety insurance includes: [¶] (a) The guaranteeing of behavior of persons and the guaranteeing of performance of contracts (including executing or guaranteeing bonds and undertakings required or permitted in all actions or proceedings or by law allowed), other than insurance policies and other than for payments secured by a mortgage, deed of trust, or other instrument constituting a lien or charge on real estate." (*Id.*, § 105.) The use of the phrase "other than insurance policies" does not signify that a surety bond is not an insurance policy, only that surety insurance does not include a bond to guarantee that an insurance policy will be honored. (See *Check Protection Service*, 16 Ops.Cal.Atty.Gen. 172 (1950).)[1]

The developer, Talbot Partners (Talbot), was seeking to protect itself against the contingency of the default of Cates Construction, Inc. (Cates), the

---

[1]I disagree with the majority's view that title 10 California Code of Regulations section 2695.2, subdivision (j), declares a surety bond is not an insurance policy. Sections 2695.1-2695.17 are regulations concerning, as their heading states, "Fair Claims Settlement Practices Regulations." These regulations interpret Insurance Code section 790.03, subdivision (h), which prohibits unfair claims settlement practices by those conducting the "business of insurance" (*id.*, § 790.03). Section 2695.2, subdivision (j), of the regulations says that an insurance "policy" does not include, "[f]*or the purposes of these regulations,*" " 'surety bond'

builder and principal. Transamerica Insurance Company (Transamerica) was the guarantor that if that event occurred, it would supply the money to complete the development. That *is* insurance. (Ins. Code, §§ 100, subd. (5), 105, subd. (a); Code Civ. Proc., § 995.120; *Amwest Surety Ins. Co.* v. *Wilson* (1995) 11 Cal.4th 1243, 1249, fn. 5 [48 Cal.Rptr.2d 12, 906 P.2d 1112].)

Further support for the view that Transamerica was an insurer may be found in the Restatement of Security and case law. Section 82 of the Restatement explains the nature of suretyship. Comment i (pp. 233-234) defines a "compensated surety," of which Transamerica is an example: "The term . . . mean[s] a person who engages in the business of executing surety contracts for a compensation called a premium . . . . Compensated sureties are generally incorporated. . . . [¶] . . . [O]ne engaged in the business of executing surety contracts can be expected to have contemplated and taken account of, in the premium charged, certain elements of risk . . . ." (And see Leo, *The Construction Contract Surety and Some Suretyship Defenses* (1992-1993) 34 Wm. & Mary L.Rev. 1225, 1229 ["For the most part, insurance companies underwrite surety bonds in exchange for a premium"].)

Thus, as the North Dakota Supreme Court explains, "a paid surety or bonding company is generally treated as an insurer rather than according to the strict law of suretyship. [Citations.] . . . 'A bond entered into by a compensated surety and guaranteeing the performance of a contract is a contract of insurance rather than of ordinary suretyship and is to be interpreted according to the rules relating to the former instead of the strict rules applicable to the latter. For most purposes, contracts of guaranty and suretyship are construed by the same principles as apply to insurance contracts, where they are written by companies which engage in the business of suretyship or guaranty, that is, for compensation and profit.' " (*Szarkowski* v. *Reliance Ins. Co.* (N.D. 1987) 404 N.W.2d 502, 504.) " 'The doctrine that a surety is a favorite of the law, and that a claim against him is *strictissimi juris*, does not apply where the bond or undertaking is executed upon a consideration[] by a corporation organized to make such bonds or undertakings for profit. While such corporations may call themselves "surety companies," their business is in all essential particulars that of insurers.' "

---

or 'bond.' " (Italics added.) Perhaps this is because of the way unfair claims challenges are settled under statutes or regulations. But section 2695.2, subdivision (i), of the same regulations defines an insurer as including the licensed issuer of "surety bond[s] in this state . . ."; i.e., one engaged in "the business of insurance" (*ibid.*).

The regulations recognize surety insurance as insurance, albeit of a distinct kind. "In contrast to other classes of insurance, surety insurance involves a promise to answer for the debt, default or miscarriage of a principal who has the primary duty to pay the debt or discharge the obligation and who is bound to indemnify the insurer." (Cal. Code Regs., tit. 10, § 2695.1, subd. (c).)

*(Transamerica Premier* v. *Brighton School* (Colo. 1997) 940 P.2d 348, 351-352 [940 P.2d 348].)

The majority conclude that liability insurance, unlike surety insurance, is "characterized by elements of adhesion and unequal bargaining power, public interest and fiduciary responsibility." (Maj. opn., *ante*, at p. 52.)

I doubt that the first element is found in all insurance contracts (though undoubtedly it is found in many), but even if so, it is beside the point. The Court of Appeal observed that it knew of no authority for the view that if an insurance contract is negotiated, the insured forfeits its rights to a tort recovery. The majority have not presented any such authority, and I question whether any exists. In any event, the majority do not show any evidence that the performance bond terms in this case were negotiated, and appear to concede the point (maj. opn., *ante*, at p. 53 [referring to "the typical performance bond"]). It is unlikely that a mammoth insurer like Transamerica—an economic entity that counts money in the billions of dollars and dwarfed the now defunct Talbot and Cates when they were in business— would engage in negotiations for the relatively small custom involved here.

The majority's public interest analysis is similarly unpersuasive. To begin with, they decide it is proper to distinguish surety insurance from other forms "because insureds generally do not seek to obtain commercial advantages by purchasing policies; rather, they seek protection against calamity. [Citations.] But while the typical insurance policy protects an insured against accidental and generally unforeseeable losses caused by a calamitous or catastrophic event such as disability, death, fire, or flood, the general purpose of a construction performance bond 'is to protect the creditor [the owner/obligee] against the danger that he will be unable to collect from the debtor [the general contractor/principal] for any failure in the performance of the contract.' [Citations.] In requiring a performance bond, then, the obligee 'seeks the commercial advantage of obtaining a contract with the principal which provides additional financial security.'" (Maj. opn., *ante*, at pp. 53-54.)

The foregoing passage fails to persuade. Qualified with the words *typical* and *generally* that lard the majority opinion, it sets forth putative distinctions that in fact do not exist.[2] Talbot purchased this insurance for peace of mind and security, not profit. "A special relationship exists between a commercial

---

[2] The majority invoke the qualifiers *typical* or *typically* 10 times in their opinion. And they use *general* or *generally* no fewer than 16 times as qualifying adjectives or adverbs. But I cannot take it on faith, as they apparently do, that this case is atypical or unrepresentative.

surety and an obligee that is nearly identical to that involving an insurer and an insured. [Citations.] When an obligee requests that a principal obtain a commercial surety bond to guarantee the principal's performance, the obligee is essentially insuring itself from the potentially catastrophic losses that would result in the event the principal defaults on its original obligation." (*Transamerica Premier* v. *Brighton School, supra*, 940 P.2d at p. 352.)[3]

In a construction performance bond transaction, the developer-obligee seeks a performance bond for the same reason anyone else buys casualty insurance: to shift to another the risk of an unpredictable and potentially severe loss, here the contractor's default. The surety accepts the risk under the same business principle as a casualty insurer: that the premiums collected for the coverage of numerous such risks will, together with the investment income generated by holding this money as capital, allow for a profit. The surety, like any other insurer, counts on having sufficient reserves to cover these risks without threat to its own financial security. The surety may also further spread the risk through reinsurance, as, according to the Court of Appeal, Transamerica did here.

In such a contract, whether or not titled "insurance policy," certainty is of the essence from the obligee-insured's point of view. The developer seeks a bond in order to be certain of timely, dependable performance of the construction contract. As this case demonstrates, the financial viability of the entire project may depend upon the surety's good faith performance of these duties.

As with any other form of insurance, the surety bond system allows one party to shift to another a contingent risk that the first party, the developer-obligee, cannot itself bear. The social good served by such contracts is the same served by other classes of insurance: greater freedom of activity by more participants than would be possible if each had to bear all the risks of its own enterprise.

Certainty of performance being the essential value of performance bonds, their worth is deeply undermined if sureties can regularly choose to ignore their obligations, having nothing to fear but contract damages that will

---

*Typically* and *generally*, moreover, have the unfortunate effect of distracting attention from what has occurred and removing the discussion to an abstract level, where propositions become general and hard to dispute.

[3]Moreover, any implication in the majority's discussion that the relationship between surety and obligee is analogous to that of debtor and creditor is incorrect. Talbot was seeking to protect itself against a contingency, and Transamerica was contracting to supply that protection. That is not a debtor-creditor relationship.

approximate what they would pay in performance. As the Court of Appeal reasoned: "The quasi-public nature of the insurance industry arises from the purpose and nature of the contracts and the duties which the insurer assumes. That is, the quasi-public nature arises from the contingent nature of the contract and the public's interest in promoting the conduct of business and personal affairs with confidence that in the event of calamity, there is protection. These factors apply equally to performance bond surety insurance, which is vital to real estate development."

Under most circumstances a breach of contract violates no social policy; the law limits the nonbreaching party's remedies so as to allow for "efficient breach" of the contract. But when a contract exists primarily to provide one party certainty and security in a risky enterprise, the other party's bad faith breach cannot be efficient, because it negates the very purpose of the contract. A tort remedy is justified in this context in order to deter such breaches of the covenant. "Recognizing a cause of action in tort for a commercial surety's breach of its duty to act in good faith compels commercial sureties to handle claims responsibly. When the commercial surety withholds payment of an obligee's claim in bad faith, contract damages do not compensate the obligee for the commercial surety's misconduct and have no deterrent effect to prevent such misconduct in the future. As the Arizona Supreme Court explained in *Dodge*, contract damages 'offer no motivation whatsoever for the insurer *not* to breach. If the only damages an insurer will have to pay upon a judgment of breach are the amounts that it would have owed under the policy plus interest, it has every interest in retaining the money, earning the higher rates of interest on the outside market, and hoping eventually to force the insured into a settlement for less than the policy amount.' [*Dodge* v. *Fidelity & Deposit Co. of Md.* (1989) 161 Ariz. 344 [778 P.2d 1240]] at 1242-43 (quoting *Wallis* v. *Superior Court* [(1984)] 160 Cal.App.3d 1109, [1117] [207 Cal.Rptr. 123])." (*Transamerica Premier* v. *Brighton School, supra*, 940 P.2d at p. 353.)

Continuing to consider matters of public interest, the majority also say that "the obligee does not face the same economic dilemma as an insured" (maj. opn., *ante*, at p. 54), because, inter alia, it can recover against the principal. The whole point of this kind of insurance, however, is to protect an obligee against a principal that has defaulted, which was Transamerica's duty here. Not surprisingly, Cates went out of business after it defaulted; there was no recourse against it. "As demonstrated by this case, obligees under surety contracts are as susceptible to deceptive and unfair claims settlement practices as insure[d]s and claimants under liability insurance contracts." (*General Ins. Co.* v. *Mammoth Vista Owners' Assn., supra*, 174 Cal.App.3d at p. 825.)

In any event, the majority's observation is extraneous to what is at issue here. As the Court of Appeal explained, it commonly occurs that an insured can recover against a third party for damages for which his or her insurer is obligated to pay: e.g., the victim of a negligent driver may have recourse against the driver personally and the driver's insurer, but such recourse does not necessarily bar indemnity from the victim's own automobile insurer. Whether the insured is entitled to sue in tort for an insurer's bad faith does not appear to hinge on the possibility of recovery elsewhere.

The majority conclude in effect that Transamerica will be caught between Talbot's and Cates's competing claims and will find it "difficult . . . to determine which party is in the right and whether its own performance is due under the bond." (Maj. opn., *ante*, at p. 58.) That may be, but an insurer faces the same dilemma when its insured is involved in a multivehicle auto accident with disputed facts and claims. Moreover, when the surety considers an obligee's interests in good faith, it does not necessarily act in bad faith toward the principal. For example, if Transamerica had acted in good faith toward Talbot by properly investigating the merit of Cates's foreclosure suit before joining it (see *post*, p. 69), it would not thereby have acted in bad faith toward Cates.

Furthermore, the majority rely on *Washington Internat. Ins. Co.* v. *Superior Court* (1998) 62 Cal.App.4th 981 [73 Cal.Rptr.2d 282], *Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co.* (1995) 31 Cal.App.4th 1458 [37 Cal.Rptr.2d 563], and *Schmitt* v. *Insurance Co. of North America* (1991) 230 Cal.App.3d 245 [281 Cal.Rptr. 261] (*Schmitt*).

*Schmitt*, however, held that *the principals* did not, under facts analogous to those of this case, have the right to sue for bad faith. "[I]t is not the duty of the surety to protect the principal as if the principal were an insured under an insurance policy. *The surety's duty runs to the third party obligee, here a purchaser, seller, financing agent or government agent*." (*Schmitt, supra*, 230 Cal.App.3d at p. 258, italics added.) (*Schmitt* also held, *id.* at pages 258-259, that for mixed reasons of law and fact not important here the surety had not acted in bad faith toward the obligees.)

A close reading of *Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co., supra*, 31 Cal.App.4th 1458, reveals that it is inapposite. In that case, the surety undertook to reimburse sales of "issued and validated" (*id.* at p. 1463) airline tickets if the travel agency failed to pay. An agency employee stole the ticket stock: the tickets were not issued and validated. The obligee nevertheless contended that the surety should reimburse it.

Disagreeing, the court wrote: "The broad construction [the obligee] urges would convert the document at issue into a liability insurance policy. The two kinds of contracts, however, are conceptually and legally distinct. [Citation.] An insurer undertakes to indemnify another 'against loss, damage, or liability arising from an unknown or contingent event,' whereas a surety promises to 'answer for the debt, default, or miscarriage of another.' " (*Id.* at p. 1464.) The case states that the obligee had not entered into a contract providing broad protection—not that surety insurance is a brand of protection distinct in all respects from liability insurance. The Court of Appeal discussed various differences between liability insurance and surety insurance, but none of them are relevant here.

*Washington Internat. Ins. Co.* v. *Superior Court, supra,* 62 Cal.App.4th 981, held that a surety could not defeat a statute requiring that a contractor pay a 2 percent per month penalty to a subcontractor by invoking another statute holding insurers harmless for their insureds' willful misconduct. The decision quoted the listing of the differences in *Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co., supra,* 31 Cal.App.4th 1458, between surety insurance and liability insurance, but rested its conclusion that the penalty statute prevailed on economic spreading-of-risk principles. (62 Cal.App.4th at p. 990.) It, too, is of little use in evaluating the question before us.

By contrast, the courts of other states that have considered the question before us, in light of statutes similar to those contained in our Insurance Code, have concluded that surety insurers are liable in tort for bad faith failure to perform for an obligee on a construction performance bond of the type at issue here. (*Transamerica Premier* v. *Brighton School, supra,* 940 P.2d 348; *Szarkowski* v. *Reliance Ins. Co., supra,* 404 N.W.2d 502; *Loyal Order of Moose* v. *Intern. Fidelity* (Alaska 1990) 797 P.2d 622, 626-628; *K-W Industries* v. *National Sur. Corp.* (1988) 231 Mont. 461, 464-467 [754 P.2d 502, 504-506]; *Dodge* v. *Fidelity & Deposit Co. of Md.* (1989) 161 Ariz. 344, 346 [778 P.2d 1240, 1242]; but see *Great American Ins.* v. *N. Austin Utility* (Tex. 1995) 908 S.W.2d 415, 418-424.) "The purpose of the construction performance bond . . . was . . . to protect plaintiffs from calamity— [the] default on the contract. A contractor's default has the potential for creating great financial and personal hardship to a homeowner. Surety insurance is obtained with the hope of avoiding such hardships. Imposing tort damages on a surety who in bad faith refuses to pay a valid claim will deter such conduct." (*Dodge* v. *Fidelity & Deposit Co. of Md., supra,* 778 P.2d at p. 1242.)

The facts of this case illustrate the need for a tort remedy. The evidence sufficed to find that Transamerica committed affirmative acts showing, at

best, gross neglect of Talbot's interests. The trial judge later mentioned that he "about fell out of my chair when I heard" during trial that Transamerica had joined in a foreclosure suit without investigating the validity of the underlying mechanic's lien, which turned out to include a claim for $200,000 for work that was never done. Indeed, the trial court's statement of decision declared that "at a time when Cates was out of business, Cates, through Transamerica's attorneys, filed suit to foreclose on the mechanic's lien filed by Cates in the sum of $645,367.66, further clouding Talbot's title. Transamerica joined Cates'[s] suit to foreclose by filing a first amended complaint on May 10, 1991. Transamerica failed to make any investigation of the validity of the mechanic's lien before it joined the suit to foreclose on Talbot's property." But "[t]he mechanic's lien filed by Cates (on which Transamerica filed suit to foreclose) was not justified[,] because Cates was not owed any further amounts on the contract" and "Cates . . . in fact had caused itself to be paid $276,730 more than the amount to which it was entitled."

Our Legislature permits punitive damages to be imposed for oppressive, fraudulent, or malicious conduct, the only limitation being that they be "for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) Because today's decision means that no tort remedy exists at all for bad faith breach of a construction performance bond, there is no need to discuss punitive damages. Nevertheless, I note that in imposing them, the jury found, under the instructions given and its special verdicts, that Transamerica behaved oppressively and maliciously; i.e., that its conduct was "vile, base, contemptible, miserable, wretched, or loathsome" and of such a character "that it would be looked down upon and despised by ordinarily decent people." In sum, it found Transamerica's conduct outstandingly bad.

Moreover, it is not clear to me that contract damages will make an obligee whole (e.g., if the developer loses profits or rents), or that an obligee will be able to force a surety to issue a bond that would make it whole if a principal defaults.[4]

---

[4]Transamerica also argues that Civil Code section 2808 bars Talbot from recovering in tort. That statute provides in relevant part: "Where one assumes liability as surety upon a conditional obligation, his liability is commensurate with that of the principal . . ."—i.e., it cannot be greater.

Civil Code section 2808, however, is a limitation on a recovery for contract damages. Like section 2809, which provides, "The obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and if in its terms exceeds it, it is reducible in proportion to the principal obligation," section 2808 stands for the rule of

I would hold that a tort remedy is available for the type of misconduct this case presents.

Kennard, J., and Werdegar, J., concurred.

Respondents' petition for a rehearing was denied September 29, 1999. Mosk, J., Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.

---

contract law that "the surety's express contractual liability may not exceed that of the principal." (*General Ins. Co.* v. *Mammoth Vista Owners' Assn.*, *supra*, 174 Cal.App.3d at p. 827, italics omitted.) "Section 2809 does not purport to restrict the surety's independent liability for violation of duties imposed by law." (*Ibid.*, italics omitted.) The same is true of section 2808.