Filed 1/29/21

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| GINA CHU et al., | B302792 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. 19STCV26689) |
| OLD REPUBLIC HOME PROTECTION COMPANY, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Michelle Williams Court, Judge. Affirmed.

Hee Sung Yoon, self-represented litigant and for Gina Chu, Plaintiffs and Appellants.

Claytor Law Group, James D. Claytor for Defendant and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Discussion Parts C.3 through D.

1

# I.   INTRODUCTION

Plaintiffs[1] appeal from the trial court's order dismissing with prejudice their claims against defendant[2] for breach of the implied covenant of good faith and fair dealing (bad faith claim) and violation of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq. (UCL claim)).  According to plaintiffs, because the contract on which they sued is regulated under the Insurance Code,[3] including the Unfair Insurance Practices Act (§ 790 et seq.), it should be considered insurance for purposes of tort liability and their complaint thus adequately stated a bad faith claim.  Plaintiffs also argue that the alleged violations of the regulations promulgated under section 790.03 were sufficient to state a UCL claim.  We affirm.

# II.   FACTUAL BACKGROUND[4]

Plaintiffs owned a condominium in Los Angeles.  On an unspecified date, defendant issued to plaintiffs a "Home Protection Plan" pursuant to which defendant agreed to "provide

---

[1]   Plaintiff Hee Sung Yoon is an attorney who appeared as a self-represented litigant and on behalf of plaintiff Gina Chu in the trial court.

[2]   Defendant is Old Republic Home Protection Company, Inc.

[3]   All further statutory references are to the Insurance Code, unless otherwise indicated.

[4]   The facts are taken from the operative first amended complaint.

service for covered systems and appliances [within the condominium] reported as malfunctioning during the term of the [contract] . . . ."[5]

During the effective period of the contract,[6] the condominium's heating, ventilation, and air-conditioning (HVAC) system became inoperable. Plaintiffs notified defendant of the problem, but defendant would "not allow [p]laintiffs to retain their own contractor to repair the HVAC [s]ystem." Instead, defendant engaged its own licensed HVAC contractor to perform the repairs. That contractor replaced the air condenser on the roof, but failed to inform plaintiffs about the cause of the problem or the repairs that were needed. As a result, plaintiffs were unaware that defendant's contractor had replaced the air condenser with a system that was incompatible with the air handler inside the condominium. The "mis-matched" air condenser "caused physical damage to the air handler," resulting in freon leaks.

In December 2017, plaintiffs discovered that their repaired HVAC system was not properly heating their condominium. They called defendant's contractor who informed them that the system needed freon. In June 2018, plaintiffs noticed that the HVAC system was not properly cooling their condominium. They

---

[5] As explained below, defendant is licensed and regulated under the Insurance Code as a "home protection company" and the warranty contract that it issued to plaintiffs is referred to as a "home protection contract." (§ 12740, subds. (a) & (b).)

[6] The effective date and duration of the contract were not specified in the first amended complaint.

3

once again called defendant's contractor who informed them that the system needed additional freon due to a leak.

After plaintiffs first made a claim under their homeowner's insurance policy[7] for the breakdown of their HVAC system, they retained their own contractor who confirmed that there was a leak in the HVAC system. In July 2019, plaintiffs retained a second contractor who agreed that the system had a leak and further advised that the entire system needed to be replaced. The replacement cost of the HVAC system was $8,984.

## III. PROCEDURAL BACKGROUND

In August 2019, plaintiffs filed the operative first amended complaint that asserted four causes of action against defendant: the fourth cause of action for breach of contract; the fifth cause of action, the bad faith claim;[8] the sixth cause of action, the UCL claim; and the seventh cause of action for negligence.

Defendant demurred to each of the four causes of action asserted against it. In support of its demurrer to the bad faith claim, defendant argued that it was licensed only as a home protection company—not as an insurance company—and therefore could not be sued in tort for bad faith. As to the UCL claim, defendant argued that it was based on alleged violations of

---

[7]    In addition to suing defendant, plaintiffs also sued the company that issued their homeowner's insurance policy.

[8]    Plaintiffs erroneously alleged two "fourth" causes of action. We will refer to the second of the "fourth" causes of action, the bad faith claim, as the fifth cause of action.

4

regulations promulgated under section 790.03 which did not apply to home protection companies.

The trial court conducted a hearing on November 1, 2019, and following arguments, took the matter under submission. The court then issued a written ruling that overruled the demurrer to the fourth and seventh causes of action for breach of contract and negligence. On the fifth cause of action, the bad faith claim, the court concluded that a home protection contract is not an insurance policy and thus sustained the demurrer without leave to amend.

On the sixth cause of action, the UCL claim, the trial court ruled: "The unfair business practices alleged are violations of regulations which apply to insurers. Defendant is not an insurer. The demurrer is sustained. Leave to amend will not be granted unless plaintiff can establish that facts exist sufficient to state a cause of action. [Citation.] Plaintiff[s have] the burden of establishing in what manner it would be possible to amend the complaint. [Citation.]"

On November 5, 2019, plaintiffs filed a request for dismissal without prejudice of the fourth and seventh causes of action for breach of contract and negligence, and the dismissal of those claims was entered the following day. On December 3, 2019, at plaintiffs' request, the trial court ordered the fifth and sixth causes of action for bad faith and violation of the UCL dismissed with prejudice.

On December 5, 2019, plaintiffs filed a notice of appeal from the judgment of dismissal entered after the order sustaining the demurrer.

# IV.   DISCUSSION

## A.   *Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules.  'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.  [Citation.]  We also consider matters which may be judicially noticed.' (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591 . . . .)  Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.  (*Speegle v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 42 . . . .)  When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.  (See *Hill v. Miller* (1966) 64 Cal.2d 757, 759 . . . .)" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

## B.   *Statutory Scheme Regulating Home Protection Companies*

In the mid-1970s, companies in California began marketing contracts to service and repair certain components or systems of residential structures, usually in conjunction with real estate brokers.  (Legis. Counsel's Dig., Sen. Bill No. 2222 (1977–1978 Reg. Sess.); Sen. Bill No. 2222 (1977–1978 Reg. Sess.), Ch. 1203, Legis. Findings; Cal. Dept. of Ins., Enrolled Bill Rep. on Sen. Bill No. 2222 (1977–1978 Reg. Sess.).)  "The vast majority of such contracts [had] not been executed as insurance contracts and the overwhelming majority of companies offering such contracts [had] been doing business in a capacity other than, and [had] been

qualified other than, as admitted insurers." (Sen. Bill No. 2222 (1977–1978 Reg. Sess.), Ch. 1203, Legis. Findings.) But "[n]o specific form of state regulation of this evolving industry" existed in California. (*Ibid.*)

"On May 3, 1978, the Attorney General issued an opinion that companies offering such contracts were transacting insurance, and the issuance of that opinion . . . produced uncertainty for the beneficiaries of such existing contracts and for those engaged in or related to this industry." (Sen. Bill No. 2222 (1977–1978 Reg. Sess.), Ch. 1203, Legis. Findings.) Because there were more than 100,000 contracts to provide such repair services in force at the time of the Attorney General's opinion, the Legislature deemed it necessary to enact a new regulatory scheme within the Department of Insurance "for the qualification, control and functioning" of the industry. (*Ibid.*)

The initial draft of the senate bill that would enact that regulatory scheme stated that it would provide for the regulation of persons engaged in the sale of home maintenance contracts "*as insurers*, subject to specified provisions of the Insurance Code. Specifically, [the bill] would (1) define *home protection insurance as a class of insurance* authorized to be transacted in this state . . . ." (Sen. Bill No. 2222 (1977–1978 Reg. Sess.) as introduced June 7, 1978, italics added.) That initial version also amended section 100—which specified the classes of insurance in the state—to include a class of "[*h*]*ome protection*" insurance. (Sen. Bill No. 2222 (1977–1978 Reg. Sess.) as introduced June 7, 1978.) It also defined home protection insurance as "*insurance* against the cost of repair or replacement of structural components or appliances of a home necessitated by wear and tear or inherent defect of any such structural component or appliance, or

7

necessitated by the failure of an inspection to detect the likelihood of any such loss, but shall not include insurance against consequential damages arising from the failure of any structural component or appliance of a home." (*Ibid.*, italics added.)

The final version of the bill, Senate Bill No. 2222 (1977–1978 Reg. Sess.) (Senate Bill No. 2222), however, deleted the references to insurers and insurance, and instead referred to home maintenance or warranty contracts as "home protection contracts." (Sen. Bill No. 2222, approved and filed Sept. 26, 1978, Sen. Final Hist. (1977–1978 Reg. Sess.) p. 994.) The final version also added Part 7 to Division 2 of the Insurance Code, commencing with section 12740. (Sen. Bill No. 2222, approved and filed Sept. 26, 1978, Sen. Final Hist. (1977–1978 Reg. Sess.) p. 994.) That new section defined a home protection contract as "any contract or agreement whereby, for a predetermined fee, a person undertakes for a specified period of time, to repair or replace all or any part of any component, system or appliance of a home necessitated by wear and tear, deterioration or inherent defect, or by the failure of any inspection to detect the likelihood of any such loss. [¶] Such contract shall provide for a system of service for effectuating such repair or replacement and shall not include protection against consequential damage from the failure of any component, system or appliance." (§ 12740.) The section also defined a "home protection company" as "any person licensed pursuant to this part which issues home protection contracts." (*Ibid.*)

Newly enacted section 12742 provided that "[h]ome protection contracts and home protection companies, and all matters incident to or concerned with such contracts and

companies, shall be exclusively subject to and regulated by the provisions of this part [namely, Part 7, "Home Protection"] and, except as provided in [s]ection 12743, shall not be governed by any other provision of this code."  Newly enacted section 12743 specified the provisions of the Insurance Code applicable to home protection contracts and companies, including section 790 "relating to [u]nfair [p]ractices."  Section 12743 further explained that the term "'Insurer'" means a "home protection company" and "'Policy' or 'insurance' [means a] home protection contract." (§ 12743, subd. (j).)

The enrolled bill report on Senate Bill No. 2222 issued by the Department of Insurance recommended that the governor sign the final version of the bill.  (Cal. Dept. of Ins., Enrolled Bill Rep. for Sen. Bill No. 2222 (1977–1978 Reg. Sess.) p. 2.)  Among other things, the report explained that Senate Bill No. 2222 "would create a regulatory scheme for home warranty contracts, and would specify that they are not considered to be 'insurance' and that they are subject only to certain other provisions of the Insurance Code."  (Cal. Dept. of Ins., Enrolled Bill Rep. for Sen. Bill No. 2222 (1977–1978 Reg. Sess.) p. 1.)

C.    *Bad Faith Claim*

1.    <u>Legal Principles Re:  Insurance Bad Faith</u>

"[I]t is well established that a covenant of good faith and fair dealing is implicit in every contract.  [Citations.]  The essence of the implied covenant is that neither party to a contract will do anything to injure the right of the other to receive the benefits of the contract.  [Citations.]  [¶]  Because the covenant of good faith

9

and fair dealing essentially is a contract term that aims to effectuate the contractual intentions of the parties, 'compensation for its breach has almost always been limited to contract rather than tort remedies.' [Citations.] At present, this court recognizes only one exception to that general rule: tort remedies are available for a breach of the covenant in cases involving insurance policies. [Citations.] In the insurance policy setting, an insured may recover damages not otherwise available in a contract action, such as emotional distress damages resulting from the insurer's bad faith conduct [citation] and punitive damages if there has been oppression, fraud, or malice by the insurer [citation]." (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28*, 43–44 (*Cates*).)

###### 2. Analogy to Insurance

Plaintiffs contend that because home protection contracts fall within the Insurance Code's definition of insurance, and companies that issue insurance can be liable in tort for breach of the implied covenant, their fifth cause of action stated a claim for insurance bad faith. In support of that conclusion, they cite the Attorney General's 1978 opinion that home protection contracts qualify as insurance under the Code, thereby suggesting that the Code's definition controls the issue of whether home protection companies are liable for tortious breach of the implied covenant.

As an initial matter, the Attorney General's 1978 opinion was subsequently addressed—and effectively superseded—by the statutory scheme enacted in response to it. As the history of that scheme shows, the Legislature purposely refrained from categorizing home protection contracts as traditional insurance

10

and provided that only certain of the regulatory provisions of the Insurance Code would apply to such contracts. Thus, plaintiffs' reliance on the Attorney General's opinion to show that home protection contracts are insurance is misplaced.

Moreover, as plaintiffs acknowledge, whether a contract qualifies as insurance under the Insurance Code for regulatory purposes is not dispositive of the tort liability issue. As the court in *Cates, supra*, 21 Cal.4th 28 observed, "the inclusion of a particular contract in the Insurance Code for regulatory purposes does not require its classification as insurance for other purposes." (*Id.* at p. 51.) Instead, when analyzing whether a given type of contract constitutes insurance for purposes of tort liability, courts "must evaluate whether policy considerations recognized in common law support the availability of tort remedies in the context of [that type of contract]." (*Id.* at p. 52.) The court in *Cates* explained that "tort recovery is considered appropriate in the insurance policy setting because such contracts are characterized by elements of adhesion and unequal bargaining power, public interest and fiduciary responsibility." (*Ibid.*)

Here, an evaluation of the policy considerations underlying tort liability in the traditional insurance context demonstrates that home protection contracts are not sufficiently analogous to insurance to support the imposition of tort liability.

a. Adhesion and Unequal Bargaining Power

There is nothing in the record to suggest that sellers and buyers of residential property who enter into home protection contracts lack meaningful bargaining power. To the contrary, the

11

statutory scheme that regulates home protection contracts indicates that they "have in most instances been concluded in relation to the transfer of residential properties . . . ." (Sen. Bill No. 2222 (1977–1978 Reg. Sess.), Ch. 1203, Legis. Findings, p. 981.)[9]  As such, they are incidental to the negotiation of a sales contract in which the buyer and seller are ordinarily bargaining at arms-length with relatively equal bargaining power.  Further, parties to a residential sales negotiation can conclude that transaction without also entering into a home protection contract. As a result, such contracts do not appear to be the product of disparate bargaining power that would otherwise support the imposition of tort remedies.

           b.      Fiduciary Responsibility and Public Interest

As acknowledged by the court in *Cates, supra*, 21 Cal.4th 28, "a principal basis for recognizing tort liability in the context of liability insurance [is] the insurer's assumption of the insured's defense and settlement negotiations of third party claims [citations] . . . ," which responsibilities give rise to fiduciary or quasi-fiduciary obligations on the part of the insurer. (*Id*. at p. 56.)  In the context of home protection contracts, those types of responsibilities do not arise on the part of the companies that issue them.  Home protection companies do not undertake the

---

[9]     Prior to 1978, home protection contracts had "largely been sold to sellers of residential properties for the benefit of the purchasers," a practice which suggests that those contracts were intended to enhance the marketability of the seller's property. (Cal. Dept. of Ins., Enrolled Bill Rep. on Sen. Bill 2222 (1977–1978 Reg. Sess.) p. 2.)

quasi-fiduciary responsibilities of defending homeowners or settling claims against them; instead, their duties to homeowners are limited to the repair, or if necessary, the replacement of specifically covered home systems or appliances.  The absence of such quasi-fiduciary policy considerations also supports the conclusion that home protection companies should not be subject to additional tort remedies for breaches of their repair and replacement obligations under home protection contracts.

In *Cates, supra*, 21 Cal.4th 28, the court also explained that tort remedies are available in the insurance policy context because they further the public interest.  The court observed that "insurance is a 'quasi-public' service" (*id.* at p. 54) because insureds seek "protection against calamity," not mere commercial advantage (*id.* at p. 53 ["the typical insurance policy protects an insured against accidental and generally unforeseeable losses caused by a calamitous or catastrophic event such as disability, death, fire, or flood"]).  They therefore purchase insurance protection against such events primarily for peace of mind and security.  (*Id.* at p. 44.)

Unlike insurance policies that protect against calamity or catastrophe, the home protection contracts at issue promise to repair or replace covered home systems, such as plaintiffs' HVAC system, or appliances, such as refrigerators, ovens, or water heaters.  Although, by obtaining the benefits of such a contract as part of a home purchase, a homeowner may procure a degree of economic protection against repair or replacement costs, it is not the same protection against the economic dilemma an insured faces after a catastrophic loss or accident.  In the latter scenario, the imposition of tort remedies is necessary to induce the insurer's performance of its defense and indemnity obligations or

13

to compensate fully the insured for an insurer's bad faith breach of the implied covenant. By contrast, if a home protection company breaches its contractual duty to repair or replace a covered system or appliance that malfunctions, contract damages would seem to compensate the homeowner adequately for the type of damages contemplated by the parties at the time of contracting—in other words—repair or replacement costs.

      c.      Consequences of Allowing Tort Recovery

In *Cates, supra*, 21 Cal.4th 28, the court, in evaluating whether tort liability should be imposed upon a commercial surety company, also considered the practical consequences of imposing tort remedies in the context of those types of surety contracts. (*Id.* at pp. 57–59.) As defendant notes, consideration of such consequences in the context of home protection contracts demonstrates that treating home protection companies as insurers—liable in tort as well as contract—could have adverse financial consequences similar to those the Legislature sought to avoid in 1978.

In response to the Attorney General's opinion that home protection companies should be treated as insurers, the Department of Insurance expressed concern about the financial impact of licensing such companies as regulated insurers. It estimated that the financial requirements that would be imposed on such companies as insurers would drive the majority of them out of business. Plaintiffs nevertheless urge us to impose additional tort liability on these companies. We decline and instead conclude that home protection companies are not

14

sufficiently analogous to traditional insurers to warrant tort remedies.

### 3. Violations of Section 790 as Bad Faith

Plaintiffs argue that because home protection companies are subject to section 790 and some of the regulations promulgated thereunder, they should be subject to bad faith tort liability for violations of those regulations. But, as we explain above, the fact that the Insurance Code may regulate a company is not dispositive of whether that company should be subject to the same tort liability as traditional insurance companies. Rather, that issue is determined based on the policy considerations set forth in *Cates*, *supra*, 21 Cal.4th 28 and regardless of whether home protection companies are subject to certain Insurance Code regulations.

### 4. Judicial Estoppel

Plaintiffs next contend that defendant is barred under the doctrine of judicial estoppel from denying that home protection contracts constitute insurance for purpose of bad faith liability. According to plaintiffs, in *Campion v. Old Republic Home Protection Co., Inc.* (S.D. Cal. 2012) 861 F.Supp.2d 1139 (*Campion*), defendant successfully advocated the position that its home protection contracts were consistent with the concept of insurance. Plaintiffs therefore conclude that, because defendant benefitted from that position in the *Campion* case, it cannot take an inconsistent position on the insurance issue in this action.

15

### a.  Background

In opposition to the demurrer, plaintiffs cited the federal district court ruling in *Campion, supra*, 861 F.Supp.2d 1139 and argued that the court in that case "reached the same conclusion [that] the Attorney General" reached in 1978, i.e., home protection contracts are insurance.  In its reply, defendant distinguished *Campion* and argued that "the issue of whether a [h]ome [p]rotection [p]lan was '[i]nsurance' was not before the [c]ourt in *Campion*; rather, the issue was whether a [h]ome [p]rotection [p]lan was a 'good' or 'service' within the meaning of [the Consumers Legal Remedies Act (Civil Code section 1750 et seq. (the Act))]," such that home protection companies were subject to liability for alleged violations of that Act.

At oral argument, following a colloquy regarding the legal sufficiency of plaintiffs' bad faith claim, their counsel asserted as follows:  "Now, what's interesting about [*Campion*] is, in [that case, defendant] was sued under [the Act], and there [is] a line of cases, including some Supreme Court authority, that [has] held that insurance is neither a good nor service.  So [insurance policies are] not subject to [the Act].  And, in [*Campion*, defendant] argued, 'We're not subject to the [the Act] because what we essentially issue[] are . . . insurance policies.'  So we have a situation where [defendant], in one case, saying 'We issue insurance policies,' and now in this case, they [are] saying, 'Just kidding.  What we issue[] [are] not insurance policies at all,' and I do have [defendant's] brief in [the *Campion*] case where [defendant] said, 'Hey, [defendant is] an insurance [company] under . . . section 22, and the Attorney General agreed with [defendant] . . . ,' and now [defendant] take[s] a completely

16

inconsistent position, and I can provide further briefing on that [judicial estoppel issue] if the court would like."

In response, the trial court indicated that it did not need further briefing. Defendant's counsel then stated "if [plaintiffs' counsel is] arguing judicial estoppel in this case, I [have] not seen that before and would, therefore, have some difficulty with replying on the fly as to that argument, and [to] the brief that [plaintiffs' counsel represents] was before the court [in *Campion*] and [counsel is also] making representations about things outside of the record."

Following those comments, the trial court took the matter under submission without further argument or briefing. The court then issued its final ruling on the demurrer without expressly addressing plaintiffs' belated claim of judicial estoppel.

b.      Forfeiture

Defendant maintains that plaintiffs forfeited their judicial estoppel argument by failing to timely or adequately raise it in opposition to the demurrer. We agree.

"The forfeiture rule generally applies in all civil and criminal proceedings. [Citations.] The rule is designed to advance efficiency and deter gamesmanship. As we explained in *People v. Simon* (2001) 25 Cal.4th 1082 . . . : "'"The purpose of the general doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ."'" [Citation.] "'No procedural principle is more familiar to this Court than that a *constitutional* right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the

17

failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." . . .' [Citation.] [¶] 'The rationale for this rule was aptly explained in *Sommer v. Martin* (1921) 55 Cal.App. 603 at page 610 . . . : '"In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal."'" [Citation.]" (Fn. omitted; [citations].)' [Citation.]" (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264.)

Plaintiffs cited and argued the decision in *Campion, supra*, 861 F.Supp.2d 1139 in their opposition, but did not make any argument based on the doctrine of judicial estoppel. It was not until the end of oral argument that they raised the issue, based in part on documents outside the record on the demurrer. And, although plaintiffs sought leave to brief the issue, the trial court denied leave and did not consider the estoppel issue in its final ruling. Moreover, defendant objected to the timing of the judicial estoppel argument and claimed prejudice from the late notice of the contention, including the fact that plaintiffs were relying on documents that had not been served or filed with the court.

Under these circumstances, neither the trial court nor defendant's counsel had an adequate opportunity to consider or address the estoppel argument. And, plaintiffs make no attempt to excuse their delay in raising the issue or otherwise address the prejudice that would have resulted from the belated disclosure.

We therefore conclude that they have forfeited the contention on appeal.

D.    *UCL Claim*

1.    Legal Principles

The UCL "defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.' ([Bus. & Prof. Code] § 17200.)  Its coverage is 'sweeping, embracing "'anything that can properly be called a business practice and that at the same time is forbidden by law.'"' [Citations.]  It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' [Citations.]  By proscribing 'any unlawful' business practice, '[Business and Professions Code] section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable.  [Citations.]

    "However, the law does more than just borrow.  The statutory language referring to 'any unlawful, unfair *or* fraudulent' practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law.  'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent.  "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa."' [Citations.]"  (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Company* (1999) 20 Cal.4th 163, 180.)

2.    Analysis

Relying on *Zhang v. Superior Court* (2013) 57 Cal.4th 364, plaintiffs contend that because violations of section 790.03 and the regulations promulgated thereunder can be the basis of an unlawful business practice under the UCL, the sixth cause of action stated a claim for relief.  Plaintiffs generally alleged in the sixth cause of action that defendant's "business practices of processing claims in violation of [section 790 et seq.] and [the] regulations promulgated thereunder constitute[d] an unlawful and unfair business practice[] in violation of [the UCL]."  The only specific regulatory violations mentioned in the complaint, however, were in connection with the fifth cause of action for bad faith, which alleged that defendant violated various provisions of California Code of Regulations, title 10, section 2695.9 (regulation 2695.9).  We thus consider whether regulation 2695.9 applies to defendant such that a violation of its provisions constitutes an unfair business practice.

"'Generally, the same rules of construction and interpretation which apply to statutes govern the interpretation of rules and regulations of administrative agencies.'  [Citation.] 'The fundamental rule of interpretation is to ascertain the intent of the agency issuing the regulation so as to effectuate the purpose of the law.'  [Citation.]  'In order that legislative intent be given effect,' a regulation, like a statute, 'should be construed with due regard for the ordinary meaning of the language used and in harmony with the whole system of law of which it is a part.'  [Citation.]"  (*Hoffman v. Smithwoods RV Park, LLC* (2009) 179 Cal.App.4th 390, 399.)

As we discuss above, section 12743 specified the provisions of the Insurance Code applicable to home protection contracts and companies, including section 790. The Insurance Commissioner has promulgated regulations at Code of Regulations, Title 10, Chapter 5, Subchapter 7.5, that apply to the "handling or settlement of all claims." (Cal. Code Regs., tit. 10, § 2695.1, subd. (b).) These regulations purport to apply to home protection contracts and home protection companies. (Cal. Code Regs., tit. 10, § 2695.1.) Indeed, California Code of Regulations, title 10, sections 2695.3 to 2695.7 regulate the conduct of all regulated insurers and licensees, including home protection companies.[10] California Code of Regulations, title 10, sections 2695.8 to 2695.11, however, by their express terms, apply only to particular classes of insurance. (Cal. Code Regs., tit. 10, §§ 2695.81–2695.85.) For example, California Code of Regulations, title 10, section 2695.8 sets forth "Additional Standards Applicable to Automobile Insurance" and the regulations that follow, sections 2695.81 to 2695.85, have no apparent applicability to home protection contracts.[11] (Cal. Code

---

[10]    California Code of Regulations, title 10, section 2695.3 is entitled "File and Record Documentation;" section 2695.4 is entitled "Representation of Policy Provisions and Benefits;" section 2695.5 is entitled "Duties upon Receipt of Communications;" section 2695.6 is entitled "Training and Certification;" and section 2695.7 is entitled "Standards for Prompt, Fair and Equitable Settlements."

[11]    For instance, California Code of Regulations, title 10, section 2695.85 requires that "[e]very insurer that issues automobile liability or collision insurance policies shall provide

21

Regs., tit. 10, §§ 2695.81–2695.85.)  Thus, the organization of these regulations suggests that regulation 2695.9 does not apply to all insurers and licensees under the Insurance Code.  (*Upland Police Officers Assn. v. City of Upland* (2003) 111 Cal.App.4th 1294, 1304 ["'[W]e do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness."  [Citation.]'"].)

Regulation 2695.9 is entitled "Additional Standards Applicable to First Party Residential and Commercial Property Insurance Policies" and subdivision (a) provides:  "When a residential or commercial *property insurance policy* provides for the adjustment and settlement of first party losses based on replacement cost, the following standards apply:  . . . ."  (Cal. Code Regs., tit. 10, § 2695.9, subd. (a), italics added.)  The term "property insurance policy" is not defined in California Code of Regulations, title 10, section 2695.2.  Section 10087, subdivision (a) provides:  "As used in this chapter [Chapter 8.5, Earthquake Insurance], 'policy of residential property insurance' shall mean a policy insuring individually owned residential structures [and] individually owned condominium units . . . .  A policy that does not include any of the perils insured against in a standard fire policy shall not be included in the definition of 'policy of residential property insurance.'"  Section 2071 sets forth the standard form for fire insurance, and provides that the policy shall insure "against all LOSS BY FIRE, LIGHTNING AND BY REMOVAL FROM PREMISES ENDANGERED BY THE PERILS INSURED AGAINST IN THIS POLICY, EXCEPT AS

the named insured(s) with an Auto Body Repair Consumer Bill of Rights . . . ."

22

HEREINAFTER PROVIDED . . . ."  By contrast, section 12762 lists the required contents of a "home protection contract," and lists no specific perils associated with the contract.  Although the definition for property insurance policy set forth at section 10087 is limited to its use in chapter 8.5, other provisions of the Insurance Code also refer to section 10087's definition of "'policy of residential property insurance.'"  (See, e.g., §§ 396, subd. (f), 790.031, 1625.5, 1763.1, 10104, subd. (a).)  We thus conclude that a home protection contract is not a "property insurance policy."

Because a home protection contract is not a "property insurance policy," regulation 2695.9 does not apply to defendant. Further, because plaintiffs' UCL claim is premised on their contention that defendant violated various subparts of regulation 2695.9, that claim fails as a matter of law.

## V.  DISPOSITION

The judgment is affirmed.  Defendant is awarded costs on appeal.


KIM, J.


We concur:


RUBIN, P. J.


BAKER, J.

## *Chu et al. v. Old Republic Home Protection Company*

### *B302792*

**RUBIN, P. J., Concurring:**

I agree with the majority decision, which I have signed. I write separately for a limited reason.

The court's opinion discusses a number of policy considerations and market factors that may have supported the Legislature's decision to amend the Insurance Code in 1978. Our present analysis of the statutory scheme primarily relies on legislative, administrative and judicial precedents that are for the most part over 20 years old, some much older. For example, the Attorney General's opinion was issued in 1978. The Legislature's response was to enact in the same year Insurance Code section 12740 et seq. Two of the substantive provisions of that law are sections 12742 and 12743. The former has never been amended; the latter was last amended in 1981. Our opinion also relies on a 1999 commercial surety bond case, *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28. It may be time for the Legislature to consider the relationship between insurance and home warranty contracts in light of present day economic realities and the manner in which home warranty contracts are currently marketed and utilized.

RUBIN, P. J.

1